07-0825-cv
Nassau v. Leavitt

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2007

(Argued: September 6, 2007            Decided: April 25, 2008)

Docket No. 07-0825-cv

-------------------------------------------------------x

COUNTY OF NASSAU, NEW YORK, COUNTY OF SUFFOLK, NEW
YORK, FEDERATION EMPLOYMENT AND GUIDANCE SERVICES,
INC., LONG ISLAND MINORITY AIDS COALITION, INC.,
THURSDAY'S CHILD, INC., TRACI BOWMAN, MIRIAM SPAIER,
JEROME KNIGHT, DONNA UYSAL,

        Plaintiffs-Appellants,

                -- v. --

MICHAEL O. LEAVITT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF HEALTH AND HUMAN SERVICES OF THE UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
ELIZABETH M. DUKE, IN HER OFFICIAL CAPACITY AS
ADMINISTRATOR FOR THE HEALTH RESOURCES AND SERVICES
ADMINISTRATION OF THE UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

        Defendants-Appellees.

-------------------------------------------------------x

B e f o r e :  WALKER, CALABRESI, and SACK, Circuit Judges.

    Plaintiffs-appellants appeal from an order of the United

1

States District Court for the Eastern District of New York (Joanna Seybert, <u>Judge</u>) denying plaintiffs' motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65. In so ruling, the district court found that plaintiffs had not shown a likelihood of success on the merits of their action. We disagree with that ruling and, because the parties agreed at oral argument that our resolution of that issue would decide this case, we need not remand for a finding as to irreparable harm, which was never considered by the district court.

REVERSED and REMANDED.

PETER J. CLINES, Deputy County Attorney (Lorna G. Goodman, County Attorney, <u>on the brief</u>), Mineola, N.Y., <u>for Plaintiffs-Appellants</u>.

THOMAS A. MCFARLAND, Assistant United States Attorney (Varuni Nelson, Assistant United States Attorney, <u>of counsel on the brief</u>), <u>for</u> Benton J. Campbell, United States Attorney for the Eastern District of New York, New York, N.Y., <u>for Defendants-Appellees</u>.

JOHN M. WALKER, JR., <u>Circuit Judge</u>:

Plaintiffs-appellants County of Nassau, County of Suffolk, Federation Employment and Guidance Services, Inc., Long Island Minority Aids Coalition, Inc., Thursday's Child, Inc., Traci Bowman, Miriam Spaier, Jerome Knight, and Donna Uysal (collectively "Nassau-Suffolk") sued the Secretary of the United States Department of Health and Human Services, the Administrator

for that department's Health Resources and Services Administration, and the department itself (collectively "DHHS") to recover federal funding that Nassau-Suffolk claims it is owed. Nassau-Suffolk appeals from an order of the District Court for the Eastern District of New York (Joanna Seybert, Judge) denying plaintiffs' motion for a preliminary injunction, pursuant to Fed. R. Civ. P. 65, upon finding that plaintiffs had failed to show a likelihood of success on the merits. We find that plaintiffs have shown a likelihood of success on the merits. Because the parties have agreed that our resolution of that issue is dispositive of this case, remand on the issue of irreparable harm is unnecessary.

**BACKGROUND**

The Ryan White Comprehensive AIDS Resources Emergency Act of 1990 ("the 1990 Act") was enacted to provide emergency relief funding to localities that were disproportionately affected by the HIV/AIDS epidemic. See 42 U.S.C. § 300ff (1991). The 1990 Act was modified on May 20, 1996 by the Ryan White CARE Act Amendments of 1996 ("the 1996 Amendments") and on October 20, 2000 by the Ryan White CARE Act Amendments of 2000. The purpose of the statute as so amended was "to make financial assistance available to States and other public or private nonprofit entities to provide for the development, organization, coordination and operation of more effective and cost efficient

3

systems for the delivery of essential services to individuals and families with HIV disease."  Id.  The County plaintiffs were among the recipients of this funding.

On December 19, 2006, Congress passed the Ryan White HIV/AIDS Treatment Modernization Act of 2006 ("the 2006 Act"). Before the 2006 Act, Nassau and Suffolk Counties were classified together as a single locality for the receipt of emergency funding, which funds were then distributed to the other plaintiffs.  After the 2006 Act's enactment, however, DHHS reduced the funding.  Plaintiffs contend that the funding decrease was contrary to the statutory mandate expressed in the 2006 Act.

## I.   The Iterations of the Act

### A.   The 1990 Act

The original 1990 Act established standards for determining which localities would qualify for funding.  Under the 1990 Act, areas selected for funding were deemed "Eligible Metropolitan Areas" ("EMAs").  See 42 U.S.C. § 300ff-11(a) (1991).  For a locality to qualify as an EMA in a given fiscal year, the 1990 Act set forth the following requirements:

> (1) there has been reported to and confirmed by the Director of the Centers for Disease Control [CDC] a cumulative total of more than 2,000 cases of acquired immune deficiency syndrome [within the locality]; or (2) the per capita incidence of cumulative cases of such syndrome (computed on the basis of the most recently available data on the population of the area) is not less than 0.0025.

4

*Id.* Under the 1990 Act, Nassau-Suffolk qualified as an EMA and received emergency funding.

**B.    The 1996 Amendments**

The 1996 Amendments established different eligibility requirements, stating in pertinent part:

> (a) Eligible areas
>     The Secretary . . . shall, subject to subsections (b) through (d) of this section, make grants . . . [to] any metropolitan area for which there has been reported to the Director of the [CDC] a cumulative total of more than 2,000 cases of [AIDS] for the most recent period of 5 calendar years for which such data are available.
>
> (b) Requirements regarding confirmation of cases
>         . . .
>
> (c) Requirements regarding population
>         . . .
>
> (d) Continued status as eligible area
>     Notwithstanding any other provision of this section, a metropolitan area that was an eligible area under this part for fiscal year 1996 is an eligible area for fiscal year 1997 and each subsequent fiscal year.

42 U.S.C. § 300ff-11 (1997).  The 1996 Amendments thus provided a "grandfather clause" that protected the future funding of all EMAs that had qualified for funding in fiscal year 1996.

**C.    The 2006 Act**

The 2006 Act again amended the standards under which areas could qualify for funding.  It provides:

> (a) Eligible areas
>     The Secretary . . . shall, subject to subsections (b) through (c) of this section, make grants . . . [to] any metropolitan area for which there has been reported to the Director of the [CDC] a cumulative total of more

5

than 2,000 cases of [AIDS] for the most recent period of 5 calendar years for which such data are available.

(b) Continued status as eligible area
    Notwithstanding any other provision of this section, a metropolitan area that is an eligible area for a fiscal year continues to be an eligible area until the metropolitan area fails, for three consecutive fiscal years—

(1) to meet the requirements of subsection (a) of this section; and

(2) to have a cumulative total of 3,000 or more living cases of AIDS (reported to and confirmed by the Director of the [CDC]) as of December 31 of the most recent calendar year for which such data is available.

42 U.S.C. § 300ff-11(a)-(b) (2006).  The effect, therefore, of the 2006 Act was to drop the grandfather clause and replace it with a clause that would cut off EMA status if the metropolitan area had failed both of two requirements for the last three consecutive fiscal years: (1) the requirement that the metropolitan area have more than 2000 AIDS cases reported to the Director of the CDC for the most recent five-year period for which data are available, and (2) the requirement that the metropolitan area have a cumulative total of 3000 or more living AIDS cases as of December 31 of the most recent calendar year for which data are available.

The 2006 Act also provided for a new category of areas that would receive reduced funding compared to EMAs.  A metropolitan area could qualify as a "Transitional Grant Area" ("TGA") as follows:

6

(b) Transitional areas

    For purposes of this section, the term "transitional area" means, subject to subsection (c) of this section, a metropolitan area for which there has been reported to and confirmed by the Director of the [CDC] a cumulative total of at least 1,000, but fewer than 2,000, cases of AIDS during the most recent period of 5 calendar years for which such data are available.

(c) Certain eligibility rules

    (1) Fiscal year 2007

        With respect to grants under subsection (a) of this section for fiscal year 2007, a metropolitan area that received funding under subpart I [42 U.S.C. § 300ff-11] for fiscal year 2006 but does not for fiscal year 2007 qualify under such subpart as an eligible area and does not qualify under subsection (b) of this section as a transitional area shall, notwithstanding subsection (b) of this section, be considered a transitional area.

    (2) Continued status as transitional area

        (A) In general. Notwithstanding subsection (b) of this section, a metropolitan area that is a transitional area for a fiscal year continues, except as provided in subparagraph (B), to be a transitional area until the metropolitan area fails, for three consecutive fiscal years—

        (i) to qualify under such subsection as a transitional area; and
        (ii) to have a cumulative total of 1,500 or more living cases of AIDS (reported to and confirmed by the [CDC]) as of December 31 of the most recent calendar year for which such data is available.

42 U.S.C. § 300ff-19 (2006). Notably, certain localities that never before qualified for funding as EMAs could now possibly qualify as TGAs. Furthermore, TGAs would enjoy analogous protections from the loss of funding that EMAs enjoyed.

**II. Plaintiffs' Funding**

Nassau-Suffolk qualified as an EMA under the 1990 Act. In fiscal year ("FY") 1997, although Nassau-Suffolk did not meet § 300ff-11(a)'s requirement of having more than 2000 reported AIDS cases over the previous five-year period for which data was available, the locality's funding continued under § 300ff-11(d), the 1996 Amendments' grandfather clause. Under that clause, Nassau-Suffolk's status as an EMA, and therefore its funding, would continue indefinitely because of its status as an EMA for FY 1996. See 42 U.S.C. § 300ff-11(d) (1997) ("[A] metropolitan area that was an eligible area under this part for fiscal year 1996 is an eligible area for fiscal year 1997 and each subsequent fiscal year." (emphasis added)). Nassau-Suffolk's continued status as an EMA, however, became the subject of dispute with the passage of the 2006 Act.

On February 12, 2007, after the enactment of the 2006 Act, defendant DHHS informed Nassau-Suffolk that the locality would no longer qualify as an EMA for FY 2007 but would now be categorized as a TGA because Nassau-Suffolk had 1505 cases reported to and confirmed by the CDC in the applicable five-year period. Nassau-Suffolk disputed DHHS's application of the 2006 Act and brought this suit seeking a judgment declaring that DHHS's interpretation of § 300ff-11 was erroneous. Nassau-Suffolk also moved for a temporary restraining order and preliminary injunction requesting the district court to enjoin defendants from downgrading Nassau-

8

Suffolk from an EMA to a TGA.

**III. The Parties' Arguments and the Proceedings Below**

The parties differ sharply as to the effect of the 2006 Act. DHHS argues that the 2006 Act repealed the 1996 Amendments' grandfather clause. It contends that Nassau-Suffolk failed to qualify as an EMA for FY 2007 because the locality did not have enough cases to meet the requirements of § 300ff-11(a) of the 2006 Act. DHHS argues further that § 300ff-11(b), which provides that an area that is eligible for a fiscal year generally continues to be an eligible area, is inapplicable because Nassau-Suffolk had never, in the first instance, qualified as an EMA for FY 2007. DHHS claims, however, that Nassau-Suffolk will receive funding for FY 2007 as a TGA under § 300ff-19(a) because it had between 1000 and 2000 cases during the relevant five-year period.

Nassau-Suffolk argues that the 2006 Act did not change its status. It notes that all versions of the statute have specifically used the term "fiscal year" when discussing eligibility requirements, and that plaintiffs' FY 2007 began on October 1, 2006. The 2006 Act, however, was not enacted until December 19, 2006. Thus, the 1996 Amendments – and specifically, their grandfather clause – were still in force at the beginning of FY 2007. Nassau-Suffolk contends that as of October 1, 2006, it was still protected by that clause and therefore qualified as an EMA for FY 2007.

9

When the grandfather clause was replaced more than two months later by the 2006 Act, Nassau-Suffolk claims that it was nevertheless saved because § 300ff-11(b) of the 2006 Act continued its status as an EMA. That subsection provides that "a metropolitan area that is an eligible area for a fiscal year continues to be an eligible area" until it fails, for three consecutive fiscal years, to meet the cumulative total in subsection (a) and to have a cumulative total of 3000 living AIDS cases. 42 U.S.C. § 300ff-11(b) (2006). Plaintiffs argue that because Nassau-Suffolk was an eligible area for FY 2007 (pursuant to the 1996 Amendments) and had more than 3000 living AIDS cases in the last three fiscal years, it "continue[d] to be an eligible area" entitled to funding until it failed to meet both of § 300ff-11(b)'s conditions.

The district court sided with DHHS, finding that the 2006 Act essentially wiped the slate clean regarding the status of all localities. The district court reasoned that the 2006 Act – not the 1996 Amendments – controlled the determination of a locality's status for FY 2007, notwithstanding the two-month lag between the start of FY 2007 and the passage of the 2006 Act. Under this view, Nassau-Suffolk never qualified as an EMA in FY 2007, and, as a result, § 300ff-11(b) of the 2006 Act could not save Nassau-Suffolk's status. The district court also found this view to be consistent with an excerpt of the legislative history

10

that states: "EMAs that received funding in fiscal year 2006 but were not eligible for tier one [as EMAs] in fiscal year 2007 would be added to the tier two category [as TGAs]." H.R. Rep. No. 109-695, pt. B, at 6 (2006). The district court concluded, based on this interpretation of the statute, that Nassau-Suffolk had failed to show a likelihood of success on the merits and denied the injunction. Plaintiffs Nassau-Suffolk now appeal.

**DISCUSSION**

**I.  Legal Standard**

"When reviewing a district court's denial of a preliminary injunction, we review the district court's legal holdings de novo and its ultimate decision for abuse of discretion." D.D. ex rel. V.D. v. N.Y. City Bd. of Educ., 465 F.3d 503, 510 (2d Cir. 2006). "A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." NXIVM Corp. v. Ross Inst., 364 F.3d 471, 476 (2d Cir. 2004). "[W]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success

11

standard." Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir. 2000) (internal quotation marks and citation omitted). "That is, plaintiffs must establish a clear or substantial likelihood of success on the merits." Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007) (internal quotation marks and citation omitted). Because the district court denied plaintiffs' injunction based on the absence of a likelihood of success, we examine that ground.

**II.  Plaintiffs Have Shown a Likelihood of Success on the Merits**

The outcome of this appeal turns on statutory interpretation. "Statutory construction is a holistic endeavor. In interpreting statutes, this Court reads statutory language in light of the surrounding language and framework of the statute." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 177 (2d Cir. 2006) (alteration, internal quotation marks, and citation omitted); see also Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).

12

**A.  § 300ff-11(b) Applies to Metropolitan Areas That Qualified as EMAs for FY 2006 and Looks Back in Time To Determine Eligibility for the Current Fiscal Year**

As we explain in detail below, the only way that all sections of the 2006 Act can function harmoniously is if we interpret § 300ff-11(b) as: (1) applying to metropolitan areas including those such as Nassau-Suffolk that qualified as EMAs for FY 2006 under the 1996 Amendments; and (2) looking back in time to ascertain whether such localities have failed to meet both of § 300ff-11(b)'s requirements for three consecutive fiscal years. This conclusion is supported by our determination that § 300ff-11(b) cannot operate in a solely prospective manner, and by other provisions of the statute.

**1.  § 300ff-11(b) Applies to Metropolitan Areas that Qualified as EMAs for FY 2006 under the 1996 Amendments**

Section 300ff-11(b) is entitled "Continued status as an eligible area."  42 U.S.C. § 300ff-11(b).  It provides that "a metropolitan area that is an eligible area for a fiscal year continues to be an eligible area" until the area fails both of the section's requirements for three consecutive fiscal years. Id.  The use of the phrase "continued status" indicates Congress's intent that § 300ff-11(b) operate to determine if a previously qualified EMA "continues" to qualify for EMA status in the next fiscal year.  There is no question that Nassau-Suffolk qualified as an EMA for FY 2006.  Thus, § 300ff-11(b) could

13

operate by determining its "continued" status for FY 2007. DHHS maintains and the district court found, however, that § 300ff-11(b) is simply inapplicable to previously qualified EMAs and only applies to metropolitan areas that have qualified as EMAs under the 2006 Act. We now turn to this argument.

### 2. The 2006 Act's Sunset Provision Persuades Us That the Solely Prospective Application of § 300ff-11(b) Is Unlikely to Have Been What Congress Intended

Section 300ff-11(a) of the 2006 Act sets the requirements for initially determining a metropolitan area's eligibility for EMA status. Simply stated, it provides that if a metropolitan area has more than 2000 AIDS cases reported to the CDC in the most recent five-year period for which data are available, that area qualifies as an EMA for the fiscal year. See 42 U.S.C. § 300ff-11(a) (2006). As noted earlier, however, § 300ff-11(b) allows a qualified metropolitan area to continue its EMA status until it fails both of two requirements for three consecutive fiscal years: (1) subsection (a)'s requirement of having "more than 2000 AIDS cases reported," and (2) the requirement that the area cumulatively have at least 3000 living AIDS cases as of December 31 of the most recent calendar year for which data are available. Id. § 300ff-11(b).

There is no question that, for FY 2007, Nassau-Suffolk cannot meet the requirements of § 300ff-11(a) because it had only 1505 reported cases in the applicable five-year period. But §

14

300ff-11(b) may nevertheless operate to continue Nassau-Suffolk's EMA status because Nassau-Suffolk has not failed to meet the second requirement of § 300ff-11(b) for three consecutive fiscal years. The dispositive question is: does § 300ff-11(b) apply to metropolitan areas like Nassau-Suffolk that qualified as EMAs for FY 2006 under the 1996 Amendments but that cannot qualify under the 2006 Act's initial eligibility provision as stated in § 300ff-11(a)? DHHS maintains that the answer is no. We disagree.

DHHS argues that § 300ff-11(b) is inapplicable to EMAs that qualified prior to the 2006 Act because Congress intended that provision to apply only prospectively. According to DHHS, § 300ff-11(b) only applies in subsequent fiscal years to determine the continued eligibility of localities that qualified as EMAs for FY 2007 under the 2006 Act. As a qualifier under the 1996 Amendments, DHHS maintains that Nassau-Suffolk cannot benefit from § 300ff-11(b) despite the fact that it did not fail the second requirement and thus would otherwise have been eligible for continued status.

DHHS's argument is, however, significantly weakened by the existence of the 2006 Act's sunset provision, which repeals the Act effective October 1, 2009. See 42 U.S.C. § 300ff-11, prospective amendment (2006). The application of the sunset provision renders DHHS's argument suspect for the following reason. Under DHHS's theory, an area that qualified as an EMA

15

for FY 2007 under § 300ff-11(a) of the 2006 Act would be eligible for continued status under § 300ff-11(b). Because, according to DHHS, that subsection only applies prospectively, the agency would have to wait at least three fiscal years from FY 2007 before it could determine whether the EMA met the two requirements for continued status. Thus, the earliest fiscal year in which the EMA could be shown to have failed both requirements of § 300ff-11(b) would be FY 2010, which begins on October 1, 2009. But the sunset provisions repeals the Act on that date.

Defendants' interpretation of the statute would therefore, in light of the sunset provision, tend to make § 300ff-11(b) meaningless and superfluous.[1] "We are obliged[, however,] to give effect, if possible, to every clause and word of a statute, and to render none superfluous." Tablie v. Gonzales, 471 F.3d 60, 64 (2d Cir. 2006) (alteration, internal quotation marks, and citation omitted); see Trichilo v. Sec'y of Health & Human Servs., 823 F.2d 702, 706 (2d Cir. 1987) ("[W]e will not interpret a statute so that some of its terms are rendered a nullity."); see also Acree v. Republic of Iraq, 370 F.3d 41, 56-57 (D.C. Cir. 2004) (finding one party's interpretation

---

[1] It is, of course, possible that Congress passed the law expecting that it would be reenacted at the sunset date. But in the absence of any evidence to that effect, the existence of the sunset provision is an appropriate basis for preferring Nassau-Suffolk's reading of the law to that suggested by DHHS.

16

"perplexing" and "bizarre" when statute's sunset provision is taken into account); cf. In re Eastport Assocs., 935 F.2d 1071, 1080 (9th Cir. 1991) (stating that party's argument that one interpretation would render some of statute's provisions surplusage because of the effect of a sunset provision "has merit as a matter of general statutory interpretation," but finding that retroactivity concerns outweighed this consideration).

In the absence of clear support in the statute or legislative history for DHHS's interpretation, we are persuaded that the better interpretation is that § 300ff-11(b) fully applies to a locality, like Nassau-Suffolk, that failed to meet the initial eligibility requirement of § 300ff-11(a) but previously qualified as an EMA for FY 2006.  The qualified locality then remains eligible for funding until it has failed both of § 300ff-11(b)'s requirements for three consecutive fiscal years, which may include the years immediately preceding FY 2007. This interpretation, unlike that proposed by DHHS, gives meaning to all provisions of the 2006 Act.  And in the instant case, our interpretation leads to the conclusion that Nassau-Suffolk retained its EMA status because, by virtue of having at least 3000 living AIDS cases in the relevant period, it did not fail the second part of § 300ff-11(b)'s two-part test.

**B.  Other Provisions of the 2006 Act Support Our Interpretation That Continued Eligibility Is Determined by Looking Back**

17

Other provisions of the 2006 Act also illustrate the soundness of our interpretation. As stated earlier, § 300ff-19 governs eligibility for the new TGA category. See 42 U.S.C. § 300ff-19 (2006). Like § 300ff-11, § 300ff-19 has an initial eligibility requirement; it grants TGA status to any metropolitan area with a cumulative total of less than 2000 but more than 1000 AIDS cases reported to the CDC for the most recent five-year period for which data are available. Id. § 300ff-19(b). And like § 300ff-11, § 300ff-19 goes further and provides for continued TGA status under certain circumstances. See id. § 300ff-19(c)(2). Section 300ff-19(c)(2) states that a metropolitan area that qualifies as a TGA in a fiscal year continues to qualify as a TGA until it fails both of two requirements for three consecutive fiscal years: (1) the initial eligibility requirement of having between 1000 and 2000 reported AIDS cases, and (2) the requirement that the metropolitan area have a cumulative total of 1500 or more living AIDS cases reported to the CDC as of December 31 of the most recent calendar year for which such data are available. Id.

But unlike § 300ff-11, § 300ff-19 specifically addresses the case of a metropolitan area that received funding for FY 2006 but failed to qualify for FY 2007 as an EMA under § 300ff-11, or as a transitional area under § 300ff-19(b). Section 300ff-19(c)(1) creates a safety valve for such a locality, providing that the

18

area "shall, notwithstanding subsection (b), be considered a transitional area." Id. § 300ff-19(c)(1).

DHHS argues that our interpretation that § 300ff-11(b) is backward-looking would render § 300ff-19(c)(1) meaningless. Under our interpretation, DHHS claims, if § 300ff-11(b) applies to metropolitan areas like Nassau-Suffolk, § 300ff-19(c)(1) is rendered superfluous – it would never be applied to qualify a locality as a TGA. DHHS contends that our interpretation therefore violates Congress's clear intent because § 300ff-19(c)(1) was included to provide funding to those localities that would lose EMA status under the 2006 Act.

Although we agree that Congress did indeed enact § 300ff-19(c)(1) to save certain localities' funding, we disagree that our interpretation renders § 300ff-19(c)(1) meaningless. Under our interpretation, subsection (c)(1) still operates, as intended, to save localities' funding under certain circumstances. Notably, § 300ff-19(c)(1) contains no minimum or maximum number of reported AIDS cases for a locality to qualify for TGA status. Section 300ff-19(b), by contrast, requires at least 1000 reported cases (and no more than 2000) for a locality to qualify for TGA status. Thus, a metropolitan area that qualified as an EMA for FY 2006 under the 1996 Amendments' grandfather clause, but failed to qualify for continued EMA status in FY 2007 because it could not meet both requirements of

19

§ 300ff-11(b), could not qualify for TGA status under § 300ff-19(b) if it had fewer than 1000 reported AIDS cases.  That same locality, however, could qualify for TGA status under § 300ff-19(c)(1).  In this circumstance, § 300ff-19(c)(1) would effectuate Congress's intent and save the locality's funding where another provision of the Act could not do so; our interpretation therefore has no adverse effect on the operability of § 300ff-19(c)(1).

## C.   The Legislative History Does Not Support the District Court's Interpretation

Under the district court's interpretation, "[i]n December 2006, Congress re-defined what an EMA is: a locality with more than 2000 reported cases of AIDS for the most recent 5-year period.  Nassau-Suffolk only had 1505.  Therefore, Nassau-Suffolk was not an EMA. . . ."  In other words, the district court believed that Congress intended to wipe the slate clean with the 2006 Act; a locality either qualified as an EMA for FY 2007 under § 300ff-11(a) or it did not qualify at all.  And in the latter event, § 300ff-19(c)(1) would operate to save some of the locality's funding by granting it TGA status.  Thus, under the district court's interpretation, as of December 2006, only localities that had over 2000 AIDS cases reported to the CDC over the preceding five-year period for which such data are available would qualify as EMAs for FY 2007.  All other localities would qualify as TGAs either under § 300ff-19(b) because they had over

20

1000 AIDS reports over the preceding five-year period, or under §
300ff-19(c)(1)'s safety provision because they had received
funding for FY 2006.

The district court found support for its interpretation in
two statements from the legislative history of the 2006 Act.
However, those statements, without more, do not justify the
district court's view.  First, the district court found that
Congress had spoken "specifically to the situation [the]
Plaintiffs are in."  The district court noted that the
legislative history contained the statement: "EMAs that received
funding in fiscal year 2006 but were not eligible for tier one
[i.e., EMA status] in fiscal year 2007 would be added to the tier
two category [i.e., TGA status]."  H.R. Rep. No. 109-695, pt. B,
at 6.  But this excerpt supports the plaintiffs' interpretation
just as easily as it does the district court's interpretation.
As discussed in Part II.B, Congress could have been referring to
grandfathered localities with fewer than 1000 reported AIDS cases
that would not receive any funding for FY 2007 but for the
protection of § 300ff-19(c)(1).

And such localities could present a real concern.  Under the
1996 Amendments, grandfathered EMAs that did not meet the two
requirements of § 300ff-11(b) had received funding for nearly a
decade regardless of how many (or how few) AIDS cases they had.
The 2006 Act likely seeks to strike a balance by cutting off

21

funding to localities with the lowest AIDS rates while at the same time providing safety valves and reduced funding to localities that may have low, but still significant, rates. Specifically, for previously grandfathered localities that received funding for many years prior to the 2006 Act despite having fewer than 1000 AIDS cases over the last five years, Congress provided a one-year safety valve in the form of § 300ff-19(c)(1). This makes good sense because the 2006 Act went into effect more than two months after the beginning of the fiscal year, at a time when the localities had likely already budgeted for the funding.

Congress also made clear that funding would not continue in FY 2008 unless the area qualified under one of the 2006 Act's other provisions. For localities like Nassau-Suffolk, Congress drafted § 300ff-11(b) to ensure that funding would continue as long as the locality continued to meet that provision's requirements. Nothing in the legislative history indicates that Congress was only concerned with reducing the funding of localities in the specific situation of Nassau-Suffolk.

The district court's other purported basis for its interpretation is that Congress stated "that eligibility would be granted immediately upon crossing the threshold criteria." Id. But Congress also went on to state that "if there was a declining number of AIDS cases, eligibility would be maintained for three

22

consecutive fiscal years." Id. Thus, "immediately" refers to a locality's qualification for, not disqualification from, the program. And the fact that localities could immediately become eligible for funding was important because Congress had now created the new TGA category under which certain localities that had never before qualified as EMAs could now receive funding as TGAs. The use of the word "immediately" therefore does little to shed light on the issue here. Moreover, the last sentence quoted from the legislative history indicates that Congress intended to provide for certain protections in the case of declining numbers of AIDS cases. Congress did not intend to "immediately" cease eligibility.

In sum, we find that our interpretation, which results in Nassau-Suffolk's continued EMA status, allows all of the 2006 Act's provisions to retain meaning and function harmoniously and is consistent with congressional intent as expressed in the 2006 Act and its comments. We therefore hold that Nassau-Suffolk has established a likelihood of success on the merits.

**CONCLUSION**

For the foregoing reasons, the judgment below is REVERSED and the case REMANDED to the district court for further proceedings consistent with this opinion. Any pending motions are DISMISSED as moot.

23