[869 NYS2d 511]

RIVERSIDE SOUTH PLANNING CORPORATION, Respondent, v CRP/
EXTELL RIVERSIDE, L.P., et al., Appellants.

First Department, December 30, 2008

APPEARANCES OF COUNSEL

*Michael C. Marcus*, Long Beach, and *Schlam Stone & Dolan LLP*, New York City (*Richard H. Dolan* of counsel), for appellants.

*Cravath, Swaine & Moore LLP*, New York City (*Max R. Shulman* of counsel), for respondent.

OPINION OF THE COURT

CATTERSON, J.

The instant appeal presents the issue of one party seeking to obtain through litigation and rhetoric what it plainly could not obtain from its adversaries through contract negotiations. Plaintiff claims that it is entitled to the enforcement of certain design guidelines indefinitely and absolutely. We find that it is not entitled to such enforcement because the terms of the underlying contract are plain and unambiguous. Furthermore, the contract expressly negates the possibility that its obligations were to run with the land.

In the early 1990s, Donald J. Trump allied himself with a coalition of civic, environmental and neighborhood groups, in order to gain support for his development of the land that stretches along the Hudson River from 59th to 72nd Street, the old Penn Central railway yard. In exchange for the coalition's pledge to support Trump during the governmental land-review process, Trump agreed to reach a compromise on the plan for development of Riverside South. After extensive negotiation, Trump withdrew his original proposal for development which had generated fierce public opposition and accepted a scaled-back plan for development (hereinafter referred to as the Development Plan).

The Development Plan focused on environmental sustainability and design criteria for the buildings and called for parks, open spaces and public arts programs. Trump and the coalition of community groups formed the plaintiff, the Riverside South Planning Corporation (hereinafter referred to as the RSPC), a not-for-profit corporation, designed to oversee the planning, design and construction of Riverside South pursuant to the Development Plan.

On or about March 31, 1993, Penn Yards Associates (hereinafter referred to as Penn Yards), by its general partner, Trump,

and the RSPC, together with various civic groups, entered into a four-page letter agreement (hereinafter referred to as the 1993 Agreement) setting forth the specific terms upon which the coalition of community groups would support the Development Plan. Annexed to the 1993 Agreement were two pages titled "Legal Requirements."

Under the 1993 Agreement, RSPC was to have an active role in planning Riverside South and ensuring that it was developed pursuant to the environmental sustainability and design principles set forth in the Development Plan. Specifically, Trump agreed that the parties would coordinate their efforts and that if he utilized "Special Permits," he would develop the project in substantial conformity with the Riverside South Design Guidelines (hereinafter referred to as the Design Guidelines).*

After setting forth certain joint undertakings, the 1993 Agreement binds Trump to certain obligations as follows:

> "We agree that RSPC may be dissolved at any time by mutual agreement of the parties, and that I shall have the right to dissolve RSPC if (1) we do not reach agreement on the development of the studio site, (2) Richard Kahan or a successor mutually agreed upon no longer heads RSPC or (3) any member organization withdraws from participation in RSPC. You agree to execute documents, promptly following request, and we shall jointly seek all required approvals, necessary to effect such dissolution. The agreements in this letter relating to design guidelines, park maintenance and operation, and restrictions on major modifications and rezoning shall survive the dissolution of RSPC, in which event approvals and consents of RSPC regarding these matters shall be granted by a majority of a three (3) person panel (including Donald J. Trump) to be acceptable to both me and the other members of the board of RSPC. *The agreements contained herein shall continue for ten (10) years, or such lesser period as either of the following conditions shall no longer remain satisfied: (1) the Special Permits shall remain in effect; and (2) I shall own, directly or indirectly, all or any portion of the Subject Property.*" (Emphasis added [hereinafter referred to as the sunset provision].)

---

* Special Permits were apparently city approvals without which Riverside South could not legally be developed.

The next paragraph of the 1993 Agreement reads:

"I agree that I will require any person who purchases any Parcel of the Subject Property from me so long as the Special Permits remain in effect, to agree to abide by the agreements in this letter insofar as they relate to the development of the project and the park, delegation of park maintenance, and the restrictions on seeking changes in the approved plan. In particular, I will contractually require the purchaser(s) to agree to develop such parcel in accordance with these guidelines and not to apply for any changes or modifications in the approved plan not permitted hereunder so long as the Special Permits remain in effect without approval of a majority of the members of RSPC, which approval is not to be unreasonably withheld or delayed."

Trump then agreed to fund RSPC for three years. After that period Trump had the option but not the obligation to continue the funding.

The Legal Requirements attached to the 1993 Agreement state that the 1993 Agreement was not "intended to, nor shall be interpreted to, nor shall any enforcement of the [1993] Agreement, create an interest in real property . . . lien or other encumbrance up on the Subject Property."

In 1994, Trump transferred title to Hudson Waterfront Associates, L.P. (hereinafter referred to as Hudson Waterfront), an entity in which he retained an interest, but not control. More than 10 years later, on June 17, 2005, the defendants (Extell) purchased their interest in Riverside South from Hudson Waterfront. The terms under which Extell assumed the obligations of the 1993 Agreement were set forth in an Assignment and Assumption Agreement, dated November 3, 2005, which provided that Extell:

"assume[d] all of the duties, obligations and liabilities of Assignor under [the 1993 Agreement] arising from and after the date hereof, it being understood that this Assignment shall not be deemed to be an admission by either Seller or [Extell] that there are or will be any duties, obligations or liablities in connection with the [1993 Agreement] or that the [1993 Agreement] is in effect."

RSPC maintains that initially after Extell purchased its interest in the project, Extell funded RSPC and its architects cor-

responded with RSPC and promised to provide plans for a new building (hereinafter referred to as Building I). However, when construction on Building I was about to commence, Extell allegedly switched course without RSPC's approval, constructing Building I with more glass than the Design Guidelines permitted and failing to conduct the required environmental sustainability assessments and calculations. Extell then refused to involve RSPC in any aspect of Riverside South's planning or design. As a result, Extell allegedly prevented RSPC from fulfilling its primary function, i.e., to ensure development of Riverside South, in the public interest, in accordance with the principles agreed to by the community when it permitted the project to proceed in the first place.

On November 29, 2007, RSPC filed a complaint, asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, and demanded specific performance of Extell's assumed obligations. Extell moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7) on the ground that the sunset provision barred RSPC's action.

By decision and order dated March 13, 2008, the Supreme Court denied Extell's motion, finding "the 1993 Agreement ambiguous whereby it is unclear whether the 'sunset provision' applies to the entire agreement or only to those obligations recited in the paragraph in which the provision is embedded." (2008 NY Slip Op 30836[U], *8.) The motion court explained:

> "Both interpretations proffered by the parties are reasonable. Looking at the entire body of the contract it is reasonable to conclude that where the 'sunset provision' comes at the end of a distinct set of obligations and immediately follows a provision reiterating that distinct set, it is [to] that set that the phrase 'agreements contained herein' refers. It is arguable that if it was intended by the parties that the provision apply to the entire agreement, it would follow *all* of the obligations charged to Trump." (*Id.*)

Noting that the 1993 Agreement clearly stated that its intent is to "ensure the development of the site in accordance with the approved plan," the motion court found that a reading of the sunset provision that resulted in the 1993 Agreement's expiration at the end of 10 years would be inconsistent with the intent of the contract. (*Id.*) Finally, the motion court added:

> "[Extell's] interpretation which cuts off the obliga-

tion of subsequent developers after ten years appears to be inconsistent with the intent of the contract because ten years is an inconceivably short amount of time within which to develop a project as large as Riverside South." (*Id.*)

On appeal, Extell contends that the only reasonable interpretation of the sunset provision is that all of the obligations created by the 1993 Agreement expire no later than 10 years after its signing. Extell claims that the clear and unequivocal words used by the "sophisticated parties and their lawyers" who drafted the provision, regardless of its placement on page three of the four-page agreement, in no way reflect an intent to create contractual obligations in perpetuity. For the reasons set forth below, we agree.

The fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent (*see e.g. Slatt v Slatt*, 64 NY2d 966 [1985]), and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." (*Slamow v Del Col*, 79 NY2d 1016, 1018 [1992].) Thus, a written agreement that is clear and unambiguous on its face must be enforced according to the plain meaning of its terms, and extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. (*See e.g. W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990].)

A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties. (*Teichman v Community Hosp. of W. Suffolk*, 87 NY2d 514, 520 [1996]; *Morlee Sales Corp. v Manufacturers Trust Co.*, 9 NY2d 16, 19 [1961].)

A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." (*Greenfield v Philles Records*, 98 NY2d 562, 570 [2002].) Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous. (*Innophos, Inc. v Rhodia, S.A.*, 38 AD3d 368, 369 [1st Dept 2007], *affd* 10 NY3d 25 [2008].)

Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." (*New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc.*, 28 AD3d 175, 177 [1st Dept 2006] [internal quotation marks and citation omitted].) The existence of ambiguity is determined by examining the "entire contract and consider[ing] the relation of the parties and the circumstances under which it

was executed," with the wording to be considered "in the light of the obligation as a whole and the intention of the parties as manifested thereby." (*Kass v Kass*, 91 NY2d 554, 566 [1998], quoting *Atwater & Co. v Panama R.R. Co.*, 246 NY 519, 524 [1927].) Whether a contract is ambiguous presents a question of law for resolution by the court. (*Kass*, 91 NY2d at 566.)

The Court of Appeals has made plain that the rule requiring a written agreement to "be enforced according to its terms" has special importance in transactions relating to real property:

> "We have . . . emphasized this rule's special import 'in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004], quoting *Matter of Wallace v 600 Partners Co.*, 86 NY2d 543, 548 [1995].)

In the instant case, the ordinary and natural meaning of the 1993 Agreement's words are dispositive: "[t]he agreements contained herein shall continue for ten (10) years, or such lesser period." A plain reading of these words makes clear that 10 years is the maximum term of the contract at issue, with the possibility that the term may be some "lesser period" if the specified conditions occur. We note that clear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations. (*Bethlehem Steel Co. v Turner Constr. Co.*, 2 NY2d 456, 460 [1957]; *Moore v Kopel*, 237 AD2d 124, 125 [1st Dept 1997].)

Contrary to the position of the dissent, there is no legal requirement that contractual provisions fixing the term of a contact must appear at the end of (or at any other particular place in) the document, especially in a short, informal letter agreement as is the case here. Instead, all that is required is that a provision fixing an end date be clear. (*See Reiss v Financial Performance Corp.*, 97 NY2d 195, 198 [2001], quoting *W.W.W. Assoc.*, 77 NY2d at 162 ["when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms"].)

It is evident that RSPC's interpretation of the sunset provision is its after-the-fact attempt to rewrite its plain wording to provide: "[t]he agreements [set forth above but not below] shall continue for ten (10) years, or such lesser period." No such

express statement appears anywhere in the 1993 Agreement to that effect. Because the 1993 Agreement was "[an] instrument . . . negotiated between sophisticated, counseled business people negotiating at arm's length" (*see Vermont Teddy Bear Co.*, 1 NY3d at 475 [internal quotation marks and citation omitted]), it is untenable that the parties would have intentionally left the meaning of their agreement to such vagaries as placement and punctuation. This is especially true given the obvious need for "commercial certainty" in a huge, multi-billion-dollar real estate deal. (*Id.* at 475.)

It is also worth mentioning that RSPC could not bind Trump's successors under the theory that the obligations set forth in the 1993 Agreement were covenants running with the land because the agreement expressly states that it was not to be recorded. (*Deepdale Cleaners v Friedman*, 16 Misc 2d 716 [1957], *affd* 7 AD2d 926 [2d Dept 1959].)

Furthermore, contrary to the motion court's ruling and the view of the dissent, we believe that our reading of the sunset provision is completely consistent with the parties' intent. It is well settled that in interpreting any contract, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." (*See W.W.W. Assoc.*, 77 NY2d at 162.) Here, rather than pointing to anything in the 1993 Agreement itself to support its position, RSPC merely relies on the self-serving affidavit of its counsel as evidence of the parties' supposed intent, and what "everyone knew" about Trump's intentions to sell his interest, and other matters outside of the contract. Such unsupported statements by counsel are not entitled to any weight whatsoever on a CPLR 3211 motion. (*See McDermott v Village of Menands*, 74 AD2d 661 [3d Dept 1980].) In any event, nothing about the sunset provision's express language supports the contention that the 1993 Agreement's obligations regarding the Design Guidelines and other environmental considerations would expire at the end of 10 years if Trump were the developer, but continue in perpetuity for any other subsequent developer.

The dissent believes that there is a question about the length of time successors to the 1993 Agreement would be bound which cannot be answered on a motion to dismiss. We disagree. The provision stating "[t]he agreements contained herein shall continue for ten (10) years" is unequivocal. The other possibility contemplated is that the agreement might last for a "lesser

period." Nothing in any part of the agreement suggests that the parties contemplated it could last longer; certainly not the paragraph that follows the sunset provision.

The dissent maintains that the paragraph following the sunset provision binds Trump's successors to the 1993 Agreement "so long as the Special Permits remain in effect." However, that paragraph, when read in conjunction with the preceding paragraph, makes plain that it is only implicated when the Special Permits are in effect and Trump owns only a part of the "Subject Property" rather than the entire "Subject Property." In that eventuality, he agreed that he would "require any person who purchases any Parcel of the Subject Property from me so long as the Special Permits remain in effect, to agree to."

However, in this case, Extell rather than Trump owns all of the "Subject Property." In fact, had this situation arisen prior to the end of the 10-year period, the agreements would have terminated in that "lesser period." Thus, the dissent is construing a paragraph that by its terms applies only to a situation where Trump owned a portion of the property and sold the remainder, as extending the sunset provision for the entire agreement in perpetuity.

It may be true that RSPC wanted to obtain an unlimited and absolute commitment from Trump on behalf of his partnership or successors to abide by certain Design Guidelines indefinitely and absolutely; however, what RSPC actually obtained was only a limited and conditional commitment. To ask this Court to ignore those limitations and conditions is merely an attempt to obtain through litigation a result that RSPC was unable to achieve during negotiations.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered March 25, 2008, which denied defendants' motion to dismiss the complaint, should be reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

MOSKOWITZ, J. (dissenting). I would affirm the order of the motion court because the contract language is ambiguous making it inappropriate to dismiss at this early juncture prior to development of the record and summary judgment. The majority finds no ambiguity only by overfocusing on a single sentence.

The area located on the West Side of Manhattan known as Riverside South is a 76-acre parcel of land running north to

south from 72nd Street to 59th Street and east to west from 11th Avenue to the Hudson River. In the early 1990s, Donald Trump, who owned Riverside South, proposed a plan for its development. Various civic groups opposed his plan. After extensive negotiation among these civic groups, Trump and local government, all sides ultimately reached agreement. The civic groups agreed to support the project. In exchange, Trump agreed to withdraw his original proposal and to implement the Riverside South Development Plan (Development Plan). The Development Plan focused on environmental sustainability and design criteria for the buildings, calling for parks, open spaces and public art programs.

The civic groups created plaintiff Riverside South Planning Corporation (RSPC), a not-for-profit corporation responsible for the planning, design and construction of Riverside South. On or about March 31, 1993, Penn Yards Associates (Penn Yards), by its general partner, Trump, the RSPC and various civic groups entered into a four-page letter agreement (1993 Agreement). The 1993 Agreement set forth the terms upon which the civic groups would support the Development Plan. Annexed to the Agreement were two pages of "Legal Requirements."

Under the 1993 Agreement, the RSPC was to have an active role in planning Riverside South. Specifically, Trump agreed that the parties would coordinate their efforts and that, if he utilized "Special Permits," he would develop the project in substantial conformity with the Riverside South Design Guidelines (Design Guidelines). After setting forth certain joint undertakings, the Agreement then provided:

> "We agree that RSPC may be dissolved at any time by mutual agreement of the parties, and that I [Trump] shall have the right to dissolve RSPC if (1) we do not reach agreement on the development of the studio site, (2) Richard Kahan or a successor mutually agreed upon no longer heads RSPC or (3) any member organization withdraws from participation in RSPC. You agree to execute documents, promptly following request, and we shall jointly seek all required approvals, necessary to effect such dissolution. The agreements in this letter relating to design guidelines, park maintenance and operation, and restrictions on major modifications and rezoning shall survive the dissolution of RSPC, in which event approvals and consents of RSPC regarding

these matters shall be granted by a majority of a three (3) person panel (including Donald J. Trump) to be acceptable to both me and the other members of the board of RSPC. The agreements contained herein shall continue for ten (10) years, or such lesser period as either of the following conditions shall no longer remain satisfied: (1) the Special Permits shall remain in effect; and (2) I shall own, directly or indirectly, all or any portion of the Subject Property" (emphasis added [sunset provision]).

The very next paragraph of the 1993 Agreement reads:

"I [Trump] agree that I will require any person who purchases any Parcel of the Subject Property from me *so long as the Special Permits remain in effect,*[] to agree to abide by the agreements in this letter insofar as they relate to the development of the project and the park, delegation of park maintenance, and the restrictions on seeking changes in the approved plan. In particular, I will contractually require the purchaser(s) to agree to develop such parcel in accordance with these guidelines and not to apply for any changes or modifications in the approved plan not permitted hereunder *so long as the Special Permits remain in effect* without approval of a majority of the members of RSPC, which approval is not to be unreasonably withheld or delayed." (Emphasis added.)

Trump then agreed to fund RSPC for three years, after which, in good faith, he would consider continued funding.

In 1994, Trump transferred title to Hudson Waterfront Associates, L.P. (HWA), an entity in which he retained an interest, but not control. On June 17, 2005, defendants (Extell) purchased their interest in Riverside South from HWA. RSPC claims that Extell assumed the obligations under the 1993 Agreement through a 2005 Assignment and Assumption Agreement, and that for a time after its purchase, Extell funded RSPC, had its architects correspond with RSPC and promised to provide plans for a new building, Building I. However, when construction on Building I was about to commence, Extell allegedly switched course without RSPC's approval, constructing Building I with more glass than the Design Guidelines permitted and failing to conduct the required environmental sustainability assessments

and calculations. Extell then refused to involve RSPC in any aspect of Riverside South's planning or design and, as a result, allegedly prevented RSPC from fulfilling its primary function, i.e., to ensure development of Riverside South, in the public interest, in accordance with the principles agreed to by the community when it permitted the project to proceed in the first place.

On November 29, 2007, RSPC filed a complaint, asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing and demanding specific performance of Extell's assumed obligations. On January 18, 2008, Extell, relying on the sunset provision, moved to dismiss. Extell claimed that the entire contract was only effective for 10 years, 10 years had passed and therefore the agreement had expired by its own terms. RSPC claimed that the 10-year sunset provision only applied to *Trump's* obligations to abide by the Design Guidelines, work with RSPC on park development and maintenance and not apply for major rezonings without consent. The court denied Extell's motion, finding the 1993 Agreement ambiguous because "it is unclear whether the 'sunset provision' applies to the entire agreement or only to those obligations recited in the paragraph in which the provision is embedded." (2008 NY Slip Op 30836[U], *8.) Extell appealed.

"Whether or not a contract provision is ambiguous is a question of law to be resolved by a court" (*Van Wagner Adv. Corp. v S & M Enters.*, 67 NY2d 186, 191 [1986]; *see 1414 APF, LLC v Deer Stags, Inc.*, 39 AD3d 329, 331 [2007]). In interpreting a contract, it is important to read the writing as a whole in order to give each clause its intended purpose (*see Williams Press v State of New York*, 37 NY2d 434, 440 [1975]). " '[P]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby' " (*Duane Reade, Inc. v Cardtronics, LP*, 54 AD3d 137, 144 [2008], quoting *Atwater & Co. v Panama R.R. Co.*, 246 NY 519, 524 [1927]).

The majority focuses on the words "agreements contained herein shall continue for ten (10) years, or such lesser period" in the sunset provision to interpret the 1993 Agreement to mean that 10 years is the maximum term for the entire contract. However, once the entire contract is taken into account, the contract can be read to apply the 10-year limitation only to certain of Trump's obligations.

To begin with, it is clear that not all the obligations in the 1993 Agreement ran for 10 years. For example, Trump had only

a three-year obligation to fund RSPC. Therefore, by the very terms of the 1993 Agreement, the sunset provision cannot possibly apply to every obligation.

In addition, the paragraph immediately succeeding the sunset provision requires Trump to bind his successors to the subset of obligations from the preceding paragraph relating to "the development of the project and the park, delegation of park maintenance, and the restrictions on seeking changes in the approved plan." However, 10 years is not the time period for which this paragraph requires successors to abide by those obligations. Rather, this subsequent paragraph binds them *"so long as the Special Permits remain in effect."* (Emphasis added.) That same paragraph also requires Trump to bind successors to develop the parcel in accordance with the Design Guidelines. The repetition of those same obligations in a paragraph following the sunset provision, then, at the very least raises questions about the length of time successors are bound. Is it for the 10-year term from the preceding paragraph or is it for "so long as the Special Permits remain in effect"? This question cannot be answered on a motion to dismiss.

Further, the paragraph containing the sunset provision clarifies that provision's limitations. The phrase the majority isolates and relies upon so heavily, "agreements contained herein," occurs as the last sentence in a paragraph discussing *Trump's* obligations "relating to design guidelines, park maintenance and operation, and restrictions on major modifications and rezoning." Therefore, the phrase "agreements contained herein" does not necessarily mean the entire 1993 Agreement, but rather could easily just put a time limit on Trump's obligations relating to these issues. Had the parties intended the sunset provision to govern the entire agreement, why would they have embedded it as the fourth sentence of a paragraph dealing primarily with the dissolution of RSPC and a specific subset of Trump's obligations?

The majority reads the agreement to implicate the paragraph immediately following the sunset provision only: (1) when the Special Permits are in effect and (2) Trump owns only a part of the "Subject Property" rather than the entire "Subject Property." It then interprets the second paragraph to refer to the situation where Trump sells some portion of the property but retains an interest. The majority then argues that because Extell purchased the entire property, the second paragraph does not become implicated.

However, there is another way to interpret these two paragraphs. This is because it is not clear that the second paragraph deals only with the situation where an entity purchases part of the Subject Property while Trump retains ownership of a portion. The language requires "any person who purchases any Parcel of the Subject Property from me" to abide by the 1993 Agreement so long as the Special Permits remain in effect. There is no indication that by using the words "any Parcel" the parties meant to exempt an entity that purchased all 76 acres. If the parties meant to exempt this sort of purchaser, would they not have said so, particularly as the 1993 Agreement does contemplate the possibility that Trump would sell the entire parcel.

Moreover, the sunset provision states that it will continue for

> "ten (10) years, or such lesser period as either of the following conditions shall no longer remain satisfied: (1) the Special Permits shall remain in effect; and (2) I [Trump] shall own, directly or indirectly, all or any portion of the Subject Property." While this language is hardly a model of clarity, I agree with the majority that it contemplated a possible time period that was less than 10 years if Trump sold his entire interest to another entity. But, this time limit may only impact *Trump's* obligations. If the parties meant to tie the 10-year time limit to successor entities also, why would they not have put the 10-year time limit in the second paragraph, or said so directly?

That the language of the contract could be read to obligate Trump for only 10 years while successors could conceivably have obligations under the Design Guidelines for longer than that may be a sensible construction. The parties would have drafted the 1993 Agreement to provide for precisely that event, if, for instance, everyone knew that Trump would eventually sell his interest to another party. The 1993 Agreement certainly contemplates this possibility. However, the motivation behind this ambiguous document will never come to light because the majority cuts this case off at the motion to dismiss stage before discovery into the intent of the parties can occur.

The majority characterizes RSPC's argument to mean that the Design Guidelines and other environmental considerations would expire at the end of 10 years if Trump were the developer but continue "in perpetuity" for any other subsequent developer.

This is an incorrect characterization of RSPC's argument and a misreading of the 1993 Agreement. As I have already discussed, the 1993 Agreement states that the Design Guidelines and other considerations were to continue "so long as the Special Permits remain in effect," not "in perpetuity" as the majority claims.

I agree with the majority that *Vermont Teddy Bear Co. v 538 Madison Realty Co.* (1 NY3d 470 [2004]) mandates courts to enforce contracts according to their express terms, especially in cases involving real property. However, the majority's application of *Vermont Teddy Bear* to this case is misplaced. In *Vermont Teddy Bear* neither party claimed that the lease was ambiguous. Here, not only does RSPC claim that the 1993 Agreement is ambiguous, but the agreement is ambiguous because it contains two, possibly competing, time restrictions. The first, that the majority relies upon, could be read to restrict the entire agreement to 10 years. The second could be read to bind successors "so long as the Special Permits remain in effect."

In *Vermont Teddy Bear*, the Court of Appeals cautioned that courts " 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing' " (*id.* at 475 [internal quotation marks and citation omitted]). Yet, that is precisely what the majority does here. By ignoring the paragraph requiring successors to abide by the guidelines *"so long as the Special Permits remain in effect"* (emphasis added), the majority effectively excises that language from the 1993 Agreement.

Thus, the agreement is facially ambiguous as it is subject to more than one interpretation (*see Yanuck v Paston & Sons Agency*, 209 AD2d 207 [1994]). Accordingly, resort to extrinsic evidence is necessary to resolve the ambiguity (*Korff v Corbett*, 18 AD3d 248, 251 [2005]).

Finally, the majority's decision does not address what happens to design decisions that RSPC and either Extell or its predecessor have already made. It would undermine design agreements RSPC made with Trump or HWA during the 10-year period for Extell to fail to abide by those decisions. This would render the 1993 Agreement a complete nullity. There would have been no reason for RSPC to have entered into it, and it would have received nothing in exchange for its support of Trump's Development Plan.

Accordingly, I would affirm the order of the Supreme Court.

Tom, J.P., and Saxe, J., concur with Catterson, J.; Williams and Moskowitz, JJ., dissent in a separate opinion by Moskowitz, J.

Order, Supreme Court, New York County, entered March 25, 2008, reversed, on the law, with costs, and defendants' motion to dismiss the complaint granted. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.