Alden Global Value Recovery Master Fund, L.P. v KeyBank N.A. (2018 NY Slip Op 02241)





Alden Global Value Recovery Master Fund, L.P. v KeyBank N.A.


2018 NY Slip Op 02241


Decided on March 29, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 29, 2018

Friedman, J.P., Kahn, Gesmer, Kern, Moulton, JJ.


650928/16 5203A 5203

[*1] Alden Global Value Recovery Master Fund, L.P., etc., Plaintiff-Appellant,
v
KeyBank National Association, et al., Defendants-Respondents, Wells Fargo Bank, N.A., etc., Nominal Defendant.


Duval & Stachenfeld LLP, New York (Kirk L. Brett of counsel), for appellant.
Steptoe & Johnson, Chicago, IL (Michael Dockterman of the bar of the State of Illinois, admitted pro hac vice, of counsel), for KeyBank National Association, respondent.
Loeb & Loeb LLP, New York (Gil Feder of counsel), for Berkadia Commercial Mortgage LLC, respondent.
Miller Field Paddock & Stone, P.L.C., Troy, MI (James L. Allen of the bar of the State of Michigan, the State of Ohio and the State of Illinois, admitted pro hac vice, of counsel), for Berkadia Commercial Mortgage LLC, respondent.



Orders, Supreme Court, New York County (Anil C. Singh, J.), entered November 29, 2016, which granted defendants KeyBank National Association and Berkadia Commercial Mortgage LLC's motions to dismiss the complaint as against them with prejudice, unanimously affirmed, without costs.
The principal issue before us is whether, in granting defendants' motions to dismiss in this purported derivative action for breach of an Amended and Restated Pooling and Servicing Agreement (PSA), Supreme Court improperly interpreted the term "default," as employed in one provision of the PSA, as synonymous with the term "Event of Default," as defined in a preceding provision of the PSA. We find that Supreme Court's determination was correct, and therefore affirm.
I. Background
This appeal arose from the sale of a commercial mortgage loan for allegedly less than "fair value."
In 2007, the Bryant Park Hotel, located at 40 W. 40th Street, borrowed funds from the J.P. Morgan Chase Commercial Mortgage Securities Trust Series 2007-CIBC18 (the Trust), which was created pursuant to a pooling and servicing agreement dated March 7, 2007. Under the terms of that agreement, defendant Wells Fargo Bank was designated as the Trustee and Paying Agent, defendant Berkadia was designated as the Master Servicer and defendant KeyBank was designated as the Special Servicer. The Bryant Park Hotel loan was pooled with other commercial mortgage loans and securitized into the Trust.
Section 6.03 of the PSA limits the potential claims of liability that may be brought against the servicers of the Trust to willful misfeasance, bad faith, negligence or negligent disregard of their duties under the PSA. That section also provides that the servicers will be indemnified by the Trust for all expenses unless incurred by reason of bad faith, willful misconduct, negligence or negligent disregard.
Article VII of the PSA, entitled "Default," includes alternative definitions of the term "Event of Default" (Section 7.01[a]). The parties agree that the only definition of "Event of Default" applicable to the circumstances presented in this case is the following:
"[A]ny failure on the part of the Master Servicer [or] the Special Servicer . . . duly to observe or perform in any material respect any of its other covenants or obligations contained in this Agreement which continues unremedied for a period of 30 days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given . . . to the Master Servicer [or] the Special Servicer . . . as the case may be, with a copy to each other party to this Agreement, by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25%" (Section 7.01[a][iii] [emphasis added]).
Section 12.03(c) of the PSA (the "no-action" clause) sets forth the limited circumstances under which a certificateholder may institute suit. Section 12.03(c) provides, in pertinent part:
"No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement or any Mortgage Loan, unless, with respect to any suit, action or proceeding upon or under or with respect to this Agreement, such Holder previously shall have given to the Trustee and the Paying Agent a written notice of default hereunder, and of the continuance thereof, as herein before provided, and unless also (except in the case of a default by the Trustee) the Holders of Certificates of any Class evidencing not less than 25% of the related Percentage Interests in such Class shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding" (emphasis added).
The PSA sets forth no definition of the term "default" as employed in section 12.03(c).
In October 2011, the borrower defaulted on the loan, and Berkadia, which had been responsible for servicing the loan as Master Servicer, transferred that responsibility to KeyBank, as Special Servicer. KeyBank, as Special Servicer, was tasked with determining the "fair value" of the loan, and Berkadia, as Master Servicer, was responsible for reviewing KeyBank's fair value determination.
Effective February 27, 2012, the original pooling and servicing agreement was amended, restated and replaced by the PSA.
In April 2014, KeyBank obtained an appraisal of the land and building by Cushman & Wakefield of $71 million. Thereafter, KeyBank valued the loan at $65,058,844, even though the amount owed on the loan was $85.5 million. The nonparty Controlling Class Option Holder (the certificateholder with the largest balance of certificates in the "Controlling Class") (CCOH) elected to exercise its option to purchase the loan from the Trust. Later that month, Berkadia, as Master Servicer, approved KeyBank's valuation.
On May 20, 2014, the CCOH consummated the purchase of the loan from the Trust, but the Trust received approximately $59 million, approximately $6 million less than KeyBank's and Berkadia's valuation. A few weeks later, the loan was restructured and refinanced by a lender for more than $100 million.
On May 18, 2015, plaintiff Alden Global Recovery Master Fund, L.P., a holder of at least 25% of the Class C group of certificates, sent a letter to Wells Fargo as Trustee and Paying Agent notifying them of defaults by KeyBank and Berkadia. In that same letter, plaintiff related the above appraisal history and requested that Wells Fargo institute a suit against both KeyBank and Berkadia and offered Wells Fargo "such reasonable indemnity as it may require."
In mid-July 2015, counsel for Wells Fargo orally advised plaintiff that it would not [*2]institute a suit.
On February 23, 2016, plaintiff commenced the instant action, alleging that both KeyBank, as Special Servicer, and Berkadia, as Master Servicer, breached their duties under the PSA by failing to comply with their obligations in determining the fair value of the loan. Specifically, plaintiff alleged that KeyBank placed its reliance on a single appraisal from Cushman and Wakefield and undervalued the loan. Plaintiff further alleged that Berkadia failed in its duty to review KeyBank's valuation by ignoring KeyBank's blatant errors, which should have raised substantial doubts about the reliability of the valuation. Additionally, plaintiff alleged that neither of those defendants was entitled to indemnification and that KeyBank had failed to act in good faith.
In separate motions, both Berkadia and KeyBank moved to dismiss the complaint. As stated above, by order entered November 29, 2016, Supreme Court granted both motions on both CPLR 3211(a)(1) and (7) grounds.
On this appeal, plaintiff's principal argument is that Supreme Court erred in granting defendants' motions to dismiss based upon its incorrect interpretation of the undefined term "default," as employed in section 12.03(c) of the PSA, as having the same meaning as the term "Event of Default" as defined in section 7.01(a)(iii), in that the cases upon which Supreme Court relied are either legally or factually inapposite to the instant case. Relying on Teachers Ins. & Annuity Assn. of Am. v CRIIMI Mae Servs. Ltd. Partnership (681 F Supp 2d 501 [SD NY 2010], affd 481 Fed Appx 686 [2d Cir 2012], cert denied 568 US 1010 [2012]), plaintiff maintains that application of the term "Event of Default" is limited to the removal of a servicer and is, therefore, inapplicable to the initiation of certificateholder litigation. Plaintiff further contends that, in any event, dismissal of the complaint was improper because the language of section 12.03(c) is ambiguous. Additionally, plaintiff argues that there is case law precedent for the principal that uncapitalized, undefined general terms in a contract should not be interpreted to have the same meaning as capitalized terms defined elsewhere in the same contract.
Defendants maintain that there is controlling precedent for upholding Supreme Court's determination that the two terms in question have the same meaning, that plaintiff cannot advance its ambiguity argument on this appeal because it did not raise it before the motion court, and that, in any event, the argument lacks merit because the phrase "as herein before provided" clearly refers to default provisions of the PSA preceding section 12.03(c). Defendants further argue that the cases cited by plaintiff in support of its argument that an uncapitalized contract term should not be interpreted as synonymous with a contractually defined contract term are neither binding precedent nor factually apposite to the instant case.
II. Legal Standards
On a CPLR 3211(a)(1) motion to dismiss based upon documentary evidence, "a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law" (Leon v Martinez, 84 NY2d 83, 88 [1994]). On a CPLR 3211(a)(7) motion to dismiss for failure to state a cause of action, the complaint must be construed in the light most favorable to the plaintiff and all factual allegations must be accepted as true (see 219 Broadway Corp. v Alexander's, Inc., 46 NY2d 506, 509 [1979]). Further, on such a motion, the complaint is to be construed liberally and all reasonable inferences must be drawn in favor of the plaintiff (Leon v Martinez, 84 NY2d at 87-88).
III. Discussion
A. Interpretation of "default" as Employed in "No-action" Clause
On the issue of whether the word "default," as used in section 12.03(c) of the PSA, is synonymous with the term "Event of Default" as defined in the preceding section 7.01(a)(iii), our precedent is instructive.
In ACE Sec. Corp. v DB Structured Prods., Inc. (112 AD3d 522 [1st Dept 2013], affd 25 NY3d 581 [2015]), we were presented with a case involving a pooling and servicing agreement containing language and enumeration of provisions in a manner strikingly similar to the PSA in the instant case. Although we dismissed the action in ACE on statute of limitations grounds (and the Court of Appeals affirmed solely on that basis), we also took pains to observe that, "[i]n any [*3]event, the certificate holders lacked standing to commence the action on behalf of the trust . . . [because] [t]he "no-action" clause in section 12.03 of the PSA sets forth as a condition precedent to such an action that the certificate holders provide the trustee with a written notice of default and of the continuance thereof[,]'" and further observed that the " defaults' enumerated in the PSA concern failures of performance by the servicer or master servicer only" (112 AD3d at 523). In making that observation, we were referring to Article VIII of the pooling and servicing agreement in ACE, which is entitled "Default" and enumerates failures of performance under the definition of "Servicer Event of Default." In ACE, we concluded that the pooling and servicing agreement did not authorize the certificateholders to issue a notice of default relating to the sponsor's alleged breach of representations.
In order to reach our conclusion in ACE, we reasoned that the word "default" as employed in section 12.03 of the pooling and servicing agreement in ACE referred to the preceding enumerated definitions of "Servicer Event of Default" in that agreement. (112 AD3d at 523). Thus, ACE provides support for adherence to similar reasoning in interpreting the strikingly similar PSA in question in this case.
In ACE, we cited our earlier decision in Walnut Place LLC v Countrywide Home Loans, Inc. (96 AD3d 684, 684 [1st Dept 2012]), in which we affirmed the motion court's granting of the defendants' motion to dismiss based on our holding that the action brought by the certificateholders in that case was "barred by the no-action' clause[s] in the PSAs, which plainly limit[] certificate holders' right to sue to an Event of Default,' which, under section 7.01 of the PSAs, involves only the master servicer."[FN1] In Walnut Place, we rejected the plaintiff's argument that the provision defining "Event of Default" in each of the PSAs in that case did not apply, reasoning that the "[p]laintiff's interpretation of the no-action' clause would improperly excise the Event of Default' provision and distort the plain meaning of the clause" (96 AD3d at 685). Put otherwise, the "no-action" clause and the preceding provisions of the PSA defining "Event of Default" were to be read together. Our reasoning in Walnut Place is equally applicable in this case. The applicability of Walnut Place to this case is further demonstrated by our adherence to its reasoning in ACE notwithstanding the use of the term "default" in the "no-action" clause of the pooling and servicing agreement in that case rather than the term "Event of Default," as in the Walnut Place agreements, which made no difference in our reasoning or in our conclusion in both of those cases that the certificateholders lacked standing to sue.
Moreover, section 12.03 of the PSA in this case provides for "a written notice of default hereunder, and of the continuance thereof, as herein before provided" (emphasis added). There is no possible antecedent provision in the PSA to which "a written notice of default" could refer other than the language of section 7.01(a)(iii) requiring provision of a written notice of default to the Special and Master Servicers, as well as to all of the parties to the PSA. Moreover, we have [*4]previously concluded that the language "as herein before provided" refers back to a preceding provision of the same agreement (149 Madison LLC v Bosco, 103 AD3d 523, 524 [1st Dept 2013] [holding that the language "as hereinbefore provided," "properly read," refers to a prior portion of a lease agreement], lv dismissed 22 NY3d 950 [2013]).
Significantly, further support for interpretation of "default" as used in section 12.03 of the PSA in this case as synonymous with "Event of Default" is found in section 8.02(vii), where the two terms are used interchangeably. Section 8.02(vii) provides, in pertinent part:
"For all purposes under this Agreement, the Trustee shall not be deemed to have notice of any Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee. . ." (emphasis added).
Plaintiff's reliance on Teachers Ins. & Annuity Assn. of Am. v CRIIMI Mae Servs. Ltd. Partnership (681 F Supp 2d 501 [SD NY 2010], affd 481 Fed Appx 686 [2d Cir 2012], cert denied 568 US 1010 [2012]), is misplaced. In Teachers, the court reached the conclusion that the "Special Servicer Event of Default" definition section of the pooling and servicing agreement in that case set forth preconditions applicable only to the removal of a Special Servicer, and not to the initiation of certificateholder litigation (681 F Supp 2d at 510). In Teachers, however, the notice provisions for a "Servicer Event of Default" were combined with those governing removal of a servicer in a single section of the agreement in question (id.). In this case, however, sections 7.01(a)(i) to (x) of the PSA set forth ten events, each of which constitutes an "Event of Default," including section 7.01(a)(iii), which defines "Event of Default" on the part of the Master Servicer or the Special Servicer and sets forth notice requirements as an element of the definition of that term, while a separate section of the PSA, section 7.01(b), provides for removal of a defaulting servicer as a remedy for the default. This remedy "may" be exercised only by the Trustee or the Depositor, or must be exercised by the Trustee "at the written direction of the Directing Certificate holder or the Holders of Certificates entitled to at least 51% of the Voting Rights." There is no language in section 7.01(b) stating removal is the exclusive remedy for any default of the part of a servicer, however. Moreover, as noted, here, the 7.01(a)(iii) notice requirements are the sole antecedent provision to which the phrase "as herein before provided" in the section 12.03(c) "no-action" clause could possibly be referring. In accordance with our precedent, as evidenced by 149 Madison, such a reference dictates that we must read those two provisions together. In any event, Teachers is not binding precedent in this Court.
In sum, interpretation of the word "default," as used in section 12.03(c) (the "no-action" clause) of the PSA in this case, as synonymous with "Event of Default" as defined in the preceding section 7.01(a)(iii), is consistent not only with our precedent,[FN2] but also with the interchangeable use of the two terms in the PSA itself.
Plaintiff also argues, for the first time on this appeal, that the "no-action" clause is ambiguous. An argument raised for the first time on appeal may be considered by this Court where the party raising it alleges no new facts but, rather, raises a legal argument which appeared [*5]upon the face of the record and which could not have been avoided if brought to the opposing party's attention at the proper juncture (Vanship Holdings Ltd. v Energy Infrastructure Acquisition Corp., 65 AD3d 405, 408 [1st Dept 2009]).
Indeed, this appeal revolves around the strictly legal issue of how the PSA should be interpreted. In that regard, we have explained that
"[t]o be found ambiguous, a contract must be susceptible of more than one commercially reasonable interpretation (Ellington v EMI Music Inc., 24 NY3d 239, 244 [2014]). The existence of ambiguity must be determined by examining the entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed,' with the wording to be considered in the light of the obligation as a whole and the intention of the parties as manifested thereby' (Riverside S. Planning Corp. v CRP/Extell Riverside, L.P., 60 AD3d 61, 66—67 [1st Dept 2008], affd 13 NY3d 398 [2009]). Further, in deciding the motion, [t]he evidence will be construed in the light most favorable to the one moved against' (Kershaw v Hospital for Special Surgery, 114 AD3d 75, 82 [1st Dept 2013], citing . . . Young v New York City Health & Hosps. Corp., 91 NY2d 291, 296 [1998])" (Perella Weinberg Partners LLC v Kramer, 153 AD3d 443, 446 [1st Dept 2017]).
In this case, all that is needed to determine the validity of plaintiff's argument can be found within the four corners of the PSA, which was made part of the record. Here, upon our examining the entire PSA, considering the relation of the parties and the circumstances under which the PSA was executed, viewing the wording of the PSA in light of the obligation as a whole and the intention of the parties, and construing the evidence in the light most favorable to plaintiff, we find that the language of the "no-action" clause of the PSA is susceptible of only one reasonable interpretation, that being that the phrase "written notice of default hereunder, and of the continuance thereof, as herein before provided" (emphasis added) refers to the term "Event of Default" as defined in section 7.01(a)(iii). Thus, reading the language of 7.01(a)(iii) and 12.03(c) together, that "no-action clause" language is not ambiguous.
Moreover, plaintiff's argument that "default" as used in the section 12.03(c) "no-action" clause does not have the same meaning as "Event of Default" as defined in section 7.01(a)(iii) is not based upon any reasonable interpretation of the term "default" as employed in the "no-action" clause. Indeed, plaintiff provides no reasonable interpretation of the word "default," in the context of the phrase "written notice of default . . . as herein before provided," as an alternative to interpreting "default" as synonymous with "Event of Default." In the absence of an explanation of what preceding provision of the PSA other than section 7.01(a)(iii) provides for a written notice of default, both the word "default" and the phrase "as herein before provided" are rendered nothing more than meaningless surplusage. As there is no reasonable interpretation of use of the word "default" in the section 12.03(c) language in question other than that it means "Event of Default" as defined in section 7.01(a)(iii), plaintiff's argument is unavailing.
Plaintiff correctly relies upon Quadrant Structured Prods. Co., Ltd. v Vertin (23 NY3d 549 [2014]) for the general principles that "no-action" clauses should be read to "give effect to the precise words and language used" and should be "strictly construed" (23 NY3d at 560 [internal quotation marks omitted]). Application of those principles to the "no-action" clause in this case, however, leads to the conclusion that the phrase "as herein before provided" refers back to the notice requirements of section 7.01(a)(iii) of the PSA, and that that provision and the "no-action" clause are to be read together.
The federal district court and bankruptcy court cases cited by plaintiff in support of its view that a capitalized, defined contractual term cannot have the same meaning as an uncapitalized, undefined term do not involve circumstances or contractual provisions in any way similar to those presented in the instant case (see Sunbelt Rentals, Inc. v Charter Oak Fire Ins. Co., 839 F Supp 2d 680, 688-689 [SD NY 2012, Maas, M. J.] [drawing distinction between "equipment" and defined term "Equipment" in an equipment rental agreement]; Metro Funding Corp. v WestLB AG, 2010 WL 1050315, *27, 2010 US Dist LEXIS 26680, *72-73 [SD NY, Mar. [*6]19, 2010, No. 10-Civ-1382 (CM), McMahon, J.] [distinguishing "advances" by Servicer, as employed in one section of a Servicing Agreement, from "Servicer Advances" as defined elsewhere in the agreement]; In re LightSquared Inc., 504 BR 321, 345 and n 37 [Bankr SD NY 2013, Chapman, J.] [rejecting argument that the word "subsidiary" as used in a credit agreement should be given the same meaning as the defined term "Subsidiary"]). In any event, none of these cases are binding on this Court.
B. Conditions Precedent to Plaintiff's Attainment of Standing to Sue
Because sections 12.03(c) and 7.01(a)(iii) of the PSA are properly read together, in order for plaintiff, a certificateholder, to have attained standing to sue in this case, plaintiff must have met the conditions precedent set forth in both sections.
Section 12.03(c) sets forth four prerequisites to plaintiff's attainment of standing to sue. First, plaintiff must have provided the "Trustee and the Paying Agent a written notice of default hereunder, and of the continuance thereof, as herein before provided." Second, plaintiff must have been a holder of at least 25% of a class of certificates. Third, plaintiff must have made a written request of the Trustee to institute an action and must have offered the Trustee reasonable indemnity against the cost and expense to be incurred in pursuing the action. Fourth, prior to plaintiff's institution of suit, sixty days must have passed during which the Trustee has refused to institute such an action.
Here, a review of the documentary evidence of record, as required by CPLR 3211(a)(1), reveals that plaintiff provided Wells Fargo, the Trustee and Paying Agent, a letter dated May 18, 2015, which served as a written notice of default on the part of both KeyBank, as Special Servicer, and Berkadia, as Master Servicer, thereby meeting the first requirement. It is uncontroverted that, as plaintiff stated in its May 18, 2015 letter, plaintiff was at that time the "Holder of Certificates, with more than twenty-five percent (25%) of the Percentage Interests in Class C," and therefore met the second requirement. In the May 18, 2015 letter, plaintiff "request[ed] that the Trustee institute an action against Key[Bank] and Berkadia so as to hold them liable for the consequences of such default" (id.) and "offer[ed] to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred in connection with this proposed action," and thereby met the third requirement. With respect to the fourth requirement, it is uncontroverted that the Trustee refused to institute suit in mid-July 2015, and the record reflects that plaintiff did not institute the instant action until February 23, 2016, well over sixty days past the Trustee's refusal. Thus, the documentary evidence establishes that plaintiff has met all four of the section 12.03(c) conditions precedent.
In order to have attained standing to sue, however, plaintiff was also required to demonstrate a default that was actionable under the PSA. Section 12.03(c) Crefers to "a written notice of default hereunder . . . as herein before provided" in section 7.01(a)(iii). The latter section defines an Event of Default as
"[a]ny failure on the part of the Master Servicer
[or] the Special Servicer . . . duly to observe
or perform in any material respect any of its . . .
covenants or obligations contained in this
Agreement which continues unremedied for a period
of 30 days . . . after the date on which written
notice of such failure, requiring the same to be
remedied, shall have been given . . . to the Master
Servicer [or] the Special Servicer" (emphasis added).
Here, the record is devoid of any documentary evidence that plaintiff provided any such written notice to the Master Servicer and the Special Servicer. Furthermore, the May 18, 2015 letter itself does not indicate that copies of that letter were transmitted by plaintiff to any entity or party to the PSA other than the Trustee, as addressee.
Because the uncontroverted and unambiguous documentary evidence demonstrates that plaintiff failed to satisfy the terms of section 7.01(a)(iii) defining the Event of Default here at issue, plaintiff's compliance with the conditions precedent of section 12.03(c) does not suffice to [*7]afford it standing to sue, as it has failed to demonstrate an actionable Event of Default under the PSA. Thus, KeyBank and Berkadia have conclusively established a defense to plaintiff's asserted claims as a matter of law (Leon v Martinez, 84 NY2d at 88) and the motion court correctly granted both defendants' CPLR 3211(a)(1) motions to dismiss.
Alternatively, with respect to defendants' CPLR 3211(a)(7) motions, a review of the complaint reveals that plaintiff has stated the manner in which it complied with the first three requirements of section 12.03(c), referencing the May 18, 2015 letter and annexing a copy of that letter to its complaint as Exhibit A (record at 38). Furthermore, in its complaint, plaintiff has averred that the Trustee advised plaintiff of the Trustee's refusal to sue in mid-July 2015 (id.), and the record indicates that the complaint was filed on February 23, 2016. Nonetheless, the complaint is devoid of any allegations that plaintiff provided any written notice of default to KeyBank, Berkadia or any party to the PSA other than the Trustee. Therefore, accepting all of plaintiff's allegations as true, construing those allegations in the light most favorable to plaintiff and giving plaintiff the benefit of all reasonable inferences, we find that plaintiff has failed to plead with sufficiency that it has attained standing to sue and therefore has failed to state any cognizable causes of action. Therefore, the motion court properly granted defendants' motions to dismiss on CPLR 3211(a)(7) grounds (see Leon v Martinez, 84 NY2d at 87-88; 219 Broadway Corp. v Alexander's, Inc., 46 NY2d at 509).
In light of the foregoing disposition of this appeal, we need not consider defendants' alternative arguments in support of affirmance.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 29, 2018
DEPUTY CLERK



Footnotes

Footnote 1: The identically worded language of the no-action clauses of two identically worded pooling and servicing agreements at issue in Walnut Place provide, in pertinent part:
"No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, [1] unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as provided in this Agreement . . . ." (emphasis added) (Walnut Place, 2012 WL 13024309, Brief for Plaintiffs-Appellants, at *7).

Footnote 2: The fact that the statute of limitations issue was dispositive in ACE does not dilute the soundness or significance of our implicit reasoning there that the term "default" as used in the "no-action" clause of a pooling and servicing agreement, is synonymous with "Event of Default" as defined in a preceding section of that agreement. Furthermore, the fact that the "no-action" clauses in Walnut Place were differently, and arguably more artfully, drafted than the comparable clause in this case, in that the Walnut Place language explicitly referred to "Event of Default" rather than "default," as in this case, does not render our reasoning in Walnut Place any less applicable here than it was in ACE.