**SOLAR & ENVIRONMENTAL TECH-
NOLOGIES CORPORATION,
Plaintiff,**

v.

**Stanley ZELINGER, William Dampier,
Samuel Lazzara, and Ted K.
Kobayashi, Defendants.**

No. 3:09cv1120(MRK).

United States District Court,
D. Connecticut.

Oct. 16, 2009.

Anthony E. Ahern, Cramer & Ahern, Westport, CT, Eric Vaughn–Flam, Sanders Ortoli Vaughn–Flam Rosenstadt LLP, New York, NY, for Plaintiff.

Bradley V. Black, Law Offices of Bradley V. Black, Lake Forest, CA, Frederick S. Gold, R. Michael Meo, Jr., Shipman & Goodwin, Stamford, CT, for Defendants.

### *RULING AND ORDER*

MARK R. KRAVITZ, District Judge.

This case arises from a dispute over intellectual property rights relating to solar energy technology. Pending before the Court is a motion [doc. # 1] by Plaintiff Solar & Environmental Technologies Corporation ("SETC"), pursuant to Rule 65(d) of the *Federal Rules of Civil Proce-*

*dure,* for a preliminary injunction in aid of arbitration against Defendants Stanley Zelinger, William Dampier, Samuel Lazzara, and Ted Kobayashi (collectively, "the Defendants"). Also pending is Defendants' motion to dismiss [doc. # 35] for, among other things, a lack of subject matter and personal jurisdiction and improper venue. After permitting the parties to take limited discovery, the Court held an evidentiary hearing on an expedited basis. Having now considered the evidence and the parties' arguments, and for the reasons explained below, the Court denies the Plaintiff's motion for a preliminary injunction. Since a preliminary injunction is the only relief requested by Plaintiff, this case is dismissed.

## I.

The following facts are undisputed unless noted otherwise. Defendants are four of the inventors of certain intellectual property concerning solar energy technology (hereinafter referred to as the "Intellectual Property"). In an effort to make the Intellectual Property commercially viable, in October 2004 the Defendants, along with non-parties Ronald Derby and Robert Speiser, created Cenicom, a Connecticut limited liability corporation ("Cenicom"). Defendants and Mr. Derby each owned seventeen percent of Cenicom, while Mr. Speiser, who was brought in to help find venture capital, was given fifteen percent. Defendants were (and remain) California residents; Mr. Speiser was (and is) a Florida resident; while Mr. Derby, currently living in China, was a Connecticut resident at the time. By all accounts, Cenicom was operated without many, if any, of the formal procedures and protocols normally attendant to corporate governance. Mr. Derby handled the day-to-day operations of Cenicom and was generally viewed by himself and the other members as its President or, alternatively, the Managing Member. Shortly after its creation, Cenicom engaged as a consultant Sarah Wang, a Chinese energy expert. SETC asserts (but Defendants dispute) that at some subsequent point, she was given an ownership stake in Cenicom.

On March 28, 2006, Defendants and Mr. Derby executed an "Assignment and Transfer Agreement" (hereinafter, the "Cenicom Assignment Agreement"), through which they assigned to Cenicom "certain intellectual property and technical know-how . . . with respect to a solar powered energy system." Section 6.2 of Cenicom Assignment Agreement contains an arbitration clause, which provides that if any party believes another party to be "in default of any material obligation under this Agreement" that cannot be resolved through good-faith negotiations, "then such controversy shall be settled by arbitration of damages administered by the American Arbitration Association," with judgment enforceable "in any court in Connecticut." Under Section 7.1, The Cenicom Assignment Agreement prohibits the transfer of rights and obligations granted under the agreement without written consent, except for a transfer to an "Affiliate" of Cenicom or one of the five assignors. "Affiliate" is defined in Section 1.8 as "any corporation, partnership, trust or other business entity that directly or indirectly controls, is controlled by, or is under common control with a party."

According to SETC, the Cenicom Assignment Agreement was executed to further facilitate the attraction of venture capital, which it says had proven challenging to that point. *See generally* Pl.'s Post–Hr'g Mem. [doc. # 68] at 4–6. In an email sent in May 2006, Mr. Speiser expressed frustration to the other Cenicom members about how difficult it had been to secure funding in the absence of a working demo of the technology represented by the Intel-

lectual Property. He strongly suggested that Cenicom come together with another private company, Control Fluidics—of which Mr. Speiser was a major shareholder—to form a new corporation. On June 4, 2006, Mr. Derby emailed the Defendants and Mr. Speiser a proposal for this new company (then referred to as "Newco"). This email (read most charitably toward SETC) proposed that Newco acquire the assets—but not the obligations—of Cenicom, as well as a license from Control Fluidics for the production and sale of a low-flow toilet that it had developed.[1] Cenicom and Control Fluidics would each own 50 per cent of Newco (which later became SETC).

Mr. Derby's live testimony was inconsistent on whether Defendants ever expressly approved of the proposal set forth in the June 2006 email—or indeed, whether they expressed anything about it at all. *See* Tr. of Prelim. Inj. Hr'g [doc. # 58] at 34 ("I'm not sure whether I heard anything from them or not."); *id.* at 37 ("I think they called me [to approve the proposal]."); Tr. of Prelim. Inj. Hr'g [doc. # 63] at 177 (testifying that he heard "[j]ust silence" from the Defendants in response to the proposal, and that he "took silence to mean assent"). It is undisputed that there is no writing reflecting that any Defendant either approved or disapproved of what was outlined in Mr. Derby's email. Nonetheless, Mr. Derby proceeded to implement a version of the proposal. SETC was created some time in the summer of 2006, with Mr. Speiser made the chief executive officer and a director. *Id.* at 40–1. Mr.

Derby and Ms. Wang were also made both officers and directors, but none of Defendants were made either. *Id.* Defendants were, however, aware of SETC's creation; in October 2006, they each wrote checks to SETC for $428.57, receiving in exchange 857,144 shares in the new corporation.

On January 9, 2007, Mr. Derby and Mr. Speiser executed two agreements on behalf of Cenicom and SETC: a "Patent Assignment Agreement" and a "Know–How Transfer Agreement" (together, "the SETC Agreements"). Mr. Derby signed the agreements for Cenicom and Mr. Speiser signed for SETC. Together, the SETC Agreements purported to transfer many (if not all) of the assets of Cenicom to SETC. Mr. Derby testified that although he did not have the consent of Defendants to transfer Cenicom's assets to SETC, he did not need their consent because on the date of the SETC Agreements, January 9, 2007, the members of Cenicom owned approximately 69 percent of SETC's outstanding shares, making the two companies "affiliates" of one another.[2] *See* Tr. of Prelim. Inj. Hr'g [doc. # 63] at 170–71. Moreover, SETC suggests that the SETC Agreements "merely confirmed" the contract that Defendants had agreed to already—Mr. Derby's proposal of June 4, 2006. *See* Pl.'s Post–Hr'g Mem. [doc. # 68] at 10. For reasons not fully explained during the hearing, Mr. Derby did not alert Defendants to the fact that he intended to execute the SETC Agreements before he signed them; nor did he forward copies of the SETC Agreements to Defen-

---

1. Defendants have suggested interpreting the email as proposing that Newco obtain licenses from both Cenicom and Control Fluidics for each of their respective technologies. *See* Tr. of Prelim. Inj. Hr'g [doc. # 63] at 227–28.

2. According to Mr. Derby's calculations, each Defendant owned the 857,144 shares he had

purchased in October 2006—each worth about a 5.75% ownership stake in SETC; while Mr. Derby and Mr. Speiser owned approximately an 8.8% and 29.8% ownership share each, respectively. On July 25, 2007, SETC issued sufficient shares to new investors that the two companies would likely no longer qualify as affiliates.

dants upon signing. *See* Tr. of Prelim. Inj. Hr'g [doc. # 63] at 129–32, 170. On December 31, 2007, Mr. Derby purported to dissolve Cenicom, an outcome he says was understood by all of Cenicom's members since its creation.

Defendants, on the other hand, contend that Mr. Derby executed the SETC Agreements and dissolved Cenicom without their knowledge or consent and without the requisite legal authority. Moreover, they argue that even if they assented to the June 4, 2006 emailed proposal (which they do not concede), that proposal does not reflect what Messrs. Derby and Speiser now claim was put in place by the SETC Agreements. Whereas the June 4, 2006 email explicitly stated that Newco would acquire the assets of Cenicom, but would *not* "pick up any [of its] liabilities," SETC, through the testimony of Mr. Derby and Mr. Speiser, now assert that with the Know–How Transfer Agreement, SETC also obtained all of Cenicom's obligations—including the obligation to arbitrate. *See* Pl.'s Post–Hr'g Mem. [doc. # 68] at 14.

The record is not clear when Defendants learned of the SETC Agreements and Cenicom's purported dissolution, but on or about July 17, 2008, three of the Defendants met in Los Angeles with Mr. Speiser and Ms. Wang (with the latter two acting in their capacities as SETC officers) to try to reach an amicable resolution; these efforts were ultimately unsuccessful. Shortly after the Los Angeles meeting, Defendants formed a new company, Omnium Solar Energy, LLC ("Omnium"), and on November 3, 2008, Mr. Zelinger informed counsel for SETC that Omnium was soliciting investment for further development of the Intellectual Property at issue in this case. On or about March 10, 2009, Mr. Dampier contacted the Connecticut Secretary of State and updated Cenicom's corporate filings in an effort to re-establish its legal existence; and on June 19, 2009, these same four Defendants filed suit against SETC in a California state court, seeking a declaratory judgment as to the ownership of the Intellectual Property. *See* Compl., *Dampier et al. v. Solar & Environ. Tech. Corp., et al.,* No. 30–2009–124965 (Cal.Super. Ct. June 19, 2009) [doc. # 38–3]. They later amended their complaint to add allegations of common law and securities fraud and to add Mr. Speiser and Mr. Derby as additional defendants. *See* Am. Compl., *Dampier et al. v. Solar & Environ. Tech. Corp., et al.,* No. 30–2009–124965 (Cal.Super.Ct. Aug. 21, 2009) [doc. # 56–2].

Apparently in response to the California state court lawsuit, SETC filed a demand for arbitration in Connecticut on July 1, 2009 against Defendants. *See* Demand for Arbitration [doc. # 1–2]. Two weeks later, on July 15, SETC filed the present lawsuit, seeking a preliminary injunction in aid of arbitration that would enjoin Defendants from commercially exploiting the Intellectual Property or disclosing confidential information about it to third parties.[3] *See* Compl. [doc. # 1] at 11–12. On August 27, 2009, Defendants filed a motion to dismiss [doc. # 35] under Rule 12(b)(1) of the *Federal Rules of Civil Procedure* for lack of subject matter jurisdiction; under Rule 12(b)(2) for lack of personal jurisdiction; under Rule 12(b)(3) for improper venue; and under the *Colorado River* abstention doctrine. *See Colo. River Water Conser-*

---

**3.** Plaintiff initially included in the relief requested a mandatory injunction to compel Defendants to perform the affirmative obligations contained in the Cenicom Assignment Agreement. *See* Compl. [doc. # 1] at 12. However, during the hearing, counsel for SETC stated that SETC is no longer seeking a mandatory injunction, and the Court deems that request withdrawn. *See* Tr. of Prelim. Inj. Hr'g [doc. # 63] at 210.

*vation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

■ In support of its Motion to Dismiss, Defendants argue that since there is no agreement to arbitrate between these parties, the Court lacks subject matter jurisdiction. *See* Defs.' Mem. in Supp. of Mot. to Dismiss [doc. # 36] at 7–10. Ordinarily, "[d]etermining the existence of subject matter jurisdiction is a threshold inquiry," with dismissal appropriate "when the district court lacks the statutory or constitutional power to adjudicate [the controversy]." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir.2008) (citation omitted). But in this case, deciding Defendants' jurisdictional arguments requires an adjudication of the merits of the dispute. For example, Defendants' challenge to personal jurisdiction would likely be defeated by Section 6.2 of the Cenicom Assignment Agreement, which permits arbitration awards to be enforced "in any court in Connecticut"—but only if the arbitration agreement is applicable to these parties. Similarly, Defendants' attack on subject matter jurisdiction, premised on the alleged absence of an agreement to arbitrate, requires the Court to consider whether an arbitration agreement exists. Thus, as a threshold matter, the arguments about personal jurisdiction, subject matter jurisdiction, and the arbitration agreement all merge. *See Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir.2005) ("When a party challenges the court's subject matter jurisdiction based upon the merits of the case, that party is merely arguing that the adversary has failed to state a claim. The court has and must assume subject matter jurisdiction and hear the merits of the case.") (*citing Steel Co. v. Citizens for a Better Envir.*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

Accordingly, the Court held an evidentiary hearing to consider the merits of SETC's request for a preliminary injunction. Mr. Derby and Mr. Speiser testified during the hearing, *see* Tr. of Prelim. Inj. Hr'g [docs. # 58 & 63], and the parties submitted a number of exhibits. *See* Exhibit List [doc. # 60]. Following the hearing, and mindful of the possibility that SETC could argue that its motion "implicitly petition[s] the district court to compel arbitration," *Wabtec Corp. v. Faiveley Transport Malmo AB*, 525 F.3d 135, 140 (2d Cir.2008), the Court notified the parties on September 17, 2009 that unless either objected, the Court would construe Plaintiff's filings, in addition to the relief explicitly requested therein, to request an order compelling arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. *See* Notice [doc. # 64]. At the same time, the Court stated that it would construe Defendants' Motion to Dismiss to include a request to dismiss under Rule 12(b)(6). *Id. See Sarhank Group*, 404 F.3d at 660. Neither party objected. The Court also permitted the parties to submit post-hearing briefs, which were filed in early October. See Pl.'s Post–Hr'g Mem. [doc. # 68] and Defs.' Post–Hr'g Mem. [doc. # 69].

Whether viewed as a petition for a preliminary injunction in aid of arbitration or for an order compelling arbitration under the FAA, the threshold question in considering SETC's request is whether an agreement to arbitrate exists between the parties. Because the Court concludes that SETC has failed to demonstrate that an arbitration agreement governs the parties to this dispute, SETC's request for injunctive relief and for an order compelling arbitration is denied. Since SETC has only requested a preliminary injunction, its denial means that there is nothing left for the Court to adjudicate. Therefore, insofar as Defendants' motion to dismiss can be construed to argue that this case ought

to be dismissed for Plaintiff's failure to state a claim upon which relief can be granted, *see* Fed. R. Civ. Proc. 12(b)(6), Defendants' motion is granted.

## II.

▆ In order to obtain a preliminary injunction, the moving party must demonstrate "irreparable harm in the absence of the injunction" and "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir.2008). In the context of preliminary injunctions sought in aid of arbitration, "[t]he Second Circuit has made it clear in a series of decisions that the Court has both the power and duty to entertain [such a motion] pending the results in [an] arbitration." *Discount Trophy & Co., Inc. v. Plastic Dress–Up Co.*, No. 03cv2167(MRK), 2004 WL 350477, at *7 (D.Conn. Feb. 19, 2004) (*citing Am. Express Fin. Advisors, Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir.1998)).

▆ But in order for the Court to issue an injunction in aid of arbitration—the only relief specifically requested by Plaintiff here—there must *be* an agreement to arbitrate between these parties. *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir.2008) ("It is black letter law that an obligation to arbitrate can be based only on consent."); *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir.2003) ("[A] party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.") (citation omitted). Here, the only arbitration agreement that is potentially applicable is contained in Section 6.2 of the Cenicom Assignment Agreement. Although not a party to that agreement, SETC advances two argu-

ments for why it nonetheless may invoke that arbitration clause. First, SETC argues that all of Cenicom's rights under the Cenicom Assignment Agreement were expressly assigned to it, and therefore SETC may invoke the arbitration clause as a valid assignee. Second, SETC argues that even if it is not a valid assignee, Defendants are estopped from avoiding arbitration with SETC because the issues SETC seeks to arbitrate are "intertwined" with the Cenicom Assignment Agreement. *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir.1995). The Court considers each argument in turn.

### A. *Arbitration Agreement*

The parties do not dispute that the Cenicom Assignment Agreement contains a valid arbitration clause, or that this is the only arbitration agreement that SETC could potentially rely upon to force Defendants to arbitrate. SETC argues that the Know–How Transfer Agreement assigned to it all of Cenicom's rights and obligations under the Cenicom Assignment Agreement, including the obligation to arbitrate under the arbitration clause. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss [doc. # 44] at 6. As a valid assignee of Cenicom's rights, SETC concludes, it may enforce the arbitration clause against Defendants. *Id.* Thus, in order to evaluate SETC's claim, the Court must interpret the Know–How Transfer Agreement.

▆ Because an agreement to arbitrate is a creation of contract, "the ultimate question of whether the parties agreed to arbitrate is determined by state law." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir.2002). *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary

state-law principles that govern the formation of contracts."). Article 13.1 of the Know–How Transfer Agreement states that New York law governs its interpretation and construction, and neither party has suggested anything to the contrary. Under New York law, the "court must ascertain the intent of the parties from the plain meaning of the language employed" in the agreement itself. *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir.1996) (*quoting Tigue v. Commercial Life Ins., Co.,* 219 A.D.2d 820, 631 N.Y.S.2d 974, 975 (1995)). "[W]here 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law,' and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal." *Id.* (*quoting Am. Express Bank Ltd. v. Uniroyal Inc.,* 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1990)). As with any other agreement, under New York law, the party seeking to enforce an arbitration agreement must prove by a preponderance of the evidence that the parties actually agreed to arbitrate.[4] *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela,* 991 F.2d 42, 46 (2d Cir. 1993).

SETC asserts that Article 8 of the Know–How Transfer Agreement assigned to it all of Cenicom's rights under the Cenicom Assignment Agreement, "including the right to enforce Defendants' arbi-

tration agreement." Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss [doc. # 44] at 6. But the language of this provision is far from clear. Article 8 of the Know–How Transfer Agreement, entitled "ASSIGNMENT OF THE RIGHTS AND OBLIGATIONS OF CENICOM," states, in its entirety, as follows: "The rights and obligations of Cenicom under the agreement will be assigned to [SETC]." The word "agreement" is never defined in the Know–How Transfer Agreement—or, for that matter, in the Patent Assignment Agreement, which was executed contemporaneously by the same parties.

SETC has submitted declarations from the only signatories to the Know–How Transfer Agreement—Ronald Derby and Robert Speiser—both of whom claim in identical language that:

> Article 8 of the Know–How Transfer Agreement was included as a catch-all provision to insure that all of the rights and obligations of Cenicom were included in the transfer to SETC. It was further my intent and understanding that the term "agreement" referred to in Article 8 was the Assignment and Transfer Agreement between Cenicom, Mr. Ron Derby and the defendants dated March 28, 2006.

Aff. of Ronald Derby [doc. # 46] § 3; Aff. of Ronald Speiser [doc. # 47] § 3. SETC argues that since the meaning of "agreement" is ambiguous, the Court must con-

---

4. Relying on *Konover Dev. Corp. v. Zeller,* 228 Conn. 206, 635 A.2d 798 (1994), Defendants argue that since Mr. Derby and Mr. Speiser were their fiduciaries, *see* Conn. Gen.Stat. § 34–141, SETC's burden is one of clear and convincing evidence. *See* Defs.' Reply Mem. in Supp. of Mot. to Dismiss [doc. # 55] at 6. Both parties spend considerable time arguing whether the SETC agreements, in particular, were executed in good faith. And were this an action for breach of fiduciary duties, the Court would agree that in order to avoid liability, Mr. Speiser and Mr. Derby would

have to prove fair dealing by clear and convincing evidence. *See Konover,* 228 Conn. at 229–30, 635 A.2d 798. In this case, however, the Court is merely called upon to determine whether the arbitration agreement was transferred to SETC—a transaction Defendants have not disputed is governed by New York law—and not whether that transfer, if it occurred, was fair to Cenicom's members, which would likely be a matter of Connecticut law (and about which the Court expresses no view).

strue the contract to effectuate the intent of the contracting parties, as evidenced by the parol evidence provided by the signatories. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss [doc. # 44] at 6; Tr. of Prelim. Inj. Hr'g [doc. # 63] at 240–42. This parol evidence, SETC argues, "is simply incontrovertible as a matter of law." Pl.'s Post–Hr'g Mem. [doc. # 68] at 14. Based upon this parol evidence, SETC concludes the Court must interpret Article 8 of the Know–How Transfer Agreement to incorporate by reference the Cenicom Assignment Agreement, such that all of Cenicom's rights and obligations under that agreement were assigned to SETC. If true, SETC would be permitted to enforce the arbitration agreement against Defendants as a valid assignee. *See id.* at 13–14.

 Plaintiff is correct that "[t]he fundamental rule of contract interpretation is that agreements are construed in accord with the parties' intent." *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 869 N.Y.S.2d 511, 516 (2008). Generally, a court will look first to the writing itself to discern the intent of the parties, and will only go beyond the words used if the court finds ambiguity. *Id.; W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990). Under New York law, the existence of ambiguity is a matter for the court, and "is determined by examining the 'entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed,' with the wording to be considered 'in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *Riverside*, 869 N.Y.S.2d at 516 (*quoting Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (N.Y. 1998)).

With these principles in mind, the Court agrees that there is ambiguity in the Know–How Transfer Agreement. However, SETC has failed to carry its burden of establishing by a preponderance of the evidence that the word "agreement" in Article 8 of the Know–How Transfer Agreement was a reference to the Cenicom Assignment Agreement. Although it is true that the two signatories, Mr. Derby and Mr. Speiser, submitted affidavits that this was their intent, there are a number of reasons to believe that their statements merely represent a *post hoc* attempt to enlarge the meaning of the words actually chosen.

Most importantly, Mr. Speiser's live testimony at the hearing directly contradicted his previously-submitted affidavit. On direct examination, Mr. Speiser testified as follows:

Q: [L]ooking at Article 8 of [the Know–How Transfer Agreement], if you could turn to that. . . .

A: Yes.

. . . .

Q: It says, "The rights and obligations of Cenicom under the agreement will be assigned to [SETC]." Do you see that?

A: Yes.

Q: What agreement was it referring to?

A: The Patent Assignment and the Know–How Transfer agreement.

Q: Well, this is the Know–How Transfer Agreement.

A: Yes. Well, it meant both of these agreements and it meant basically the formation of Newco, if you will.

Q: Okay. How did Cenicom acquire the assets from the defendants and Mr. Derby?

A: By the assignment agreement of the Cenicom partners individually to Cenicom LLC. . . .

Q: So if the rights and obligations of Cenicom are being acquired in the Know–How agreement, which agreement was that referring to?

A: That would be this agreement.

Q: "This" being what?

A: The Patent Assignment agreement. THE COURT: The Patent Assignment. So the rights and obligations of Cenicom under the Know–How Transfer agreement and the Patent transfer agreement would be assigned to [SETC]?

A: Yes.

Tr. of Prelim. Inj. Hr'g [doc. # 63] at 195–96.

In other words, Mr. Speiser testified that the word "agreement" in the Know–How Transfer Agreement was a circular reference to the very same instrument (perhaps in combination with the Patent Assignment Agreement), meaning that Article 8 of the Know–How Transfer Agreement should be read as saying that: "The rights and obligations of Cenicom under the [Know–How Transfer Agreement and the Patent Assignment Agreement] will be assigned to [SETC]." Although this may seem like an odd construction at first blush, it gains some plausibility when one considers that, at the time the Know–How Transfer and Patent Assignment Agreements were executed, Mr. Derby and Mr. Speiser intended to dissolve Cenicom in the near future (and in fact, did purport to do so later that same year). Since Cenicom was given certain rights and obligations under the Know–How Transfer Agreement and the Patent Assignment Agreement, it is sensible to believe that the signatories wanted those rights to be assigned to SETC upon the anticipated

dissolution of Cenicom. For the Court's limited purpose of deciding Plaintiff's preliminary injunction request, it is not necessary to resolve conclusively the meaning of Article 8 of the Know–How Transfer Agreement. It is sufficient to hold, as the Court does here, that SETC has not shown a likelihood of success on the merits—which, in this case, would mean establishing that there is an agreement to arbitrate between these parties.[5] *See Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir.2009); *Leavitt,* 524 F.3d at 414; *see also Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.") (citation omitted) (emphasis in original).

Even if Mr. Speiser had not contradicted himself at the hearing, the Court would still be skeptical of SETC's argument, and for a variety of independent reasons. First, SETC's proffered interpretation is supported only by self-serving, vague, and conclusory statements (in both written and testimonial form) from Mr. Derby and Mr. Speiser, both of whom benefitted financially from the deal as officers, directors, and major shareholders of SETC. *See* Tr. of Prelim. Inj. Hr'g [doc. # 58] at 103–4. Insofar as the Court is required to consider their testimony as parol evidence regarding the meaning of the Know–How Transfer Agreement, the Court does not find their conclusory statements to be particularly helpful or persuasive. *See State of New York v. Home Indem. Co.,* 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 (N.Y.1985) ("[I]f the tendered

5. Moreover, even if SETC has shown "sufficiently serious questions going to the merits to make them a fair ground for litigation," it has not carried its burden to demonstrate that

the "balance of hardships tip[s] decidedly" in its favor. *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir.2009).

extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court."); *see also Kenavan v. Empire Blue Cross & Blue Shield*, 248 A.D.2d 42, 677 N.Y.S.2d 560, 563 (1998) (where the "evidence introduced by the parties extrinsic to the [contract] was not dispositive of the [interpretation] issue ... the proper interpretation is an issue of law for the court"); *Primavera v. Rose & Kiernan, Inc.*, 248 A.D.2d 842, 670 N.Y.S.2d 223, 224–25 (1998) ("If, however, extrinsic evidence does not resolve the ambiguity, the interpretation of the ambiguous contract terms remain a question of law for the court."); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1375 (E.D.N.Y.1988) ("The appraisal of the value or existence of extrinsic evidence is for the court as a matter of substantive law.").

In addition to being dramatically in Messrs. Derby and Speiser's self-interest to make the conclusory assertions that they make about the Know–How Transfer Agreement, neither of them make reference to any conversations contemporaneous with its signing discussing what the word "agreement" meant. So far as the Court is aware, they never discussed what the word meant (if anything). Also, there is no documentary record that supports their current claims. Indeed, the documentary record that does exist appears to contradict their current claims. For example, although SETC argues that the SETC Agreements "merely confirmed" the deal the Defendants accepted and agreed to in June 2006, *see* Pl.'s Post–Hr'g Mem. [doc. # 68] at 10, the record does not support that claim. Even assuming that Defendants did agree to what Mr. Derby proposed in the June 4, 2006 email—and there is not sufficient evidence in the record here to support that proposition—the SETC Agreements, signed in January 2007, do not match that proposal. In par-

ticular, the June 4, 2006 email said that "Newco" (which became SETC) would acquire Cenicom's assets, but not its obligations; and yet Mr. Derby says that the SETC Agreements transferred *both* the assets *and* the obligations of Cenicom. In other words, even if Defendants did agree to his proposal, Mr. Derby's two statements—that the SETC Agreements: 1) accurately represent the June 4, 2006 proposal; and 2) assigned both the assets and the obligations of Cenicom to SETC—seem mutually inconsistent. *Cf. Riverside*, 869 N.Y.S.2d at 516 ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties"). The Court takes no position here as to the final resolution of these issues, but absent any explanation, these apparent contradictions further undermine the reliability of Mr. Derby's testimony.

A close examination of the remainder of the Know–How Transfer Agreement also casts doubt on the interpretation of Article 8 advanced by SETC. The nine-page Know–How Transfer Agreement is exclusively concerned with the sale and transfer to SETC of "all rights and title with respect to the Know How." Know–How Transfer Agreement, Art. 2.1. "Know How" is defined as "the reports, processes, designs, drawings, and technical information with regard to the Cenicom Product." *Id.* at Art. 1.1. With the arguable exception of Article 8, every provision of the Know–How Transfer Agreement relates exclusively to the Know How itself. For example, Article 7, entitled "OBLIGATIONS OF [SETC]," commits SETC to "use its best efforts to further develop the Cenicom Project and Know How Products for sale in the United States, and other territories." *Id.* at Art. 7. Another provision, entitled "CONFIDENTIALITY," says that "[e]ach party shall keep secret

and confidential the Know How." *Id.* at Art. 9. The merger clause, moreover, states that "This Agreement and its Attachments constitute the entire agreement between the parties relating to the Know How and the Know How Products and no variation of this Agreement shall be effective unless it is in writing and signed by a duly authorized officer of each party." *Id.* at Art. 13.2. Reading Article 8 to mean what SETC urges would create a relatively dramatic incongruity: everything before and after Article 8 relates directly to the Know How, and so it would be odd to insert, at that point, a provision that purports to incorporate by reference an entirely separate agreement on only partially-related topics.

One would also think, in an otherwise precisely-crafted legal instrument, that the parties would actually invoke the name of that separate contract, rather than simply calling it "the agreement," and that they might even mention that purportedly-incorporated document elsewhere in the contract. Given that the Know–How Transfer Agreement already had one attachment, one might also expect to find the incorporated agreement physically annexed, too. The meaning of the word "agreement" in Article 8 may be ambiguous, but when read "in light of the obligation as a whole and the intention of the parties as manifested thereby," *Riverside,* 869 N.Y.S.2d at 516, it does not seem susceptible to the interpretation urged by SETC. *See Kass v. Kass,* 91 N.Y.2d 554, 567, 673 N.Y.S.2d 350, 696 N.E.2d 174 (N.Y.1998) ("[C]ourts examining isolated provisions should [ ] choose that construction which will carry out the plain purpose and object of the [agreement]."); *cf. RM Realty Holdings Corp. v. Moore,* 64 A.D.3d 434, 436, 884 N.Y.S.2d 344 (N.Y.App.Div.2009) ("A written agreement is ambiguous only if it is *reasonably* susceptible of more than one interpretation.").

Moreover, since the Know–How Transfer Agreement was drafted by an attorney, and specifically states in Article 13.1 that it "shall be governed by and construed and interpreted in accordance with the laws of New York," one would expect that the attorney was aware of New York law on incorporation-by-reference, which is quite strict: "[i]ncorporation by reference ... is appropriate only where the document to be incorporated is referred to and described in the instrument as issued so as to identify the referenced document 'beyond all reasonable doubt.'" *Shark Info. Servs. Corp. v. Crum & Forster Comm. Ins.,* 222 A.D.2d 251, 634 N.Y.S.2d 700, 701 (1995). The sole oblique reference in the Know–How Transfer Agreement to "the agreement" not only falls far short of this demanding standard—which is another independent reason to reject SETC's argument, no matter the intent—but it also buttresses the Court's conclusion that the parties never intended to incorporate the Cenicom Assignment Agreement into the Know–How Transfer Agreement. As another court put it:

> If these commercially sophisticated and counseled parties had intended to make the Plans part of their agreement, they could easily have accomplished that purpose by drafting the contractual writings so that one or more of them expressly incorporated the Plans by reference. Since the Plans are not referenced in the contractual documents at all, much less "referred to and described [therein] ... so as to [be] identif[ied] ... beyond all reasonable doubt," the Plans cannot be deemed to be incorporated by reference into the Subscription Agreement.

*Cornhusker Farms, Inc. v. Hunts Point Coop. Mkt., Inc.,* 2 A.D.3d 201, 769 N.Y.S.2d 228, 231 (2003) (citation omitted)

(alterations in original). *See also Shark Info. Servs. Corp.*, 634 N.Y.S.2d at 701 ("It is clear that none of the instant policy's oblique references to an otherwise unidentified 'Coverage Form' meet this exacting standard [of incorporation by reference]."); *Ryan, Beck & Co., LLC v. Fakih*, 268 F.Supp.2d 210, 223 (E.D.N.Y.2003); *cf. Aerotech World Trade v. Excalibur Sys.*, 236 A.D.2d 609, 654 N.Y.S.2d 386, 387 (1997) ("While an agreement to arbitrate can be incorporated by reference, any such reference must clearly show such an intent to arbitrate.").

Finally, even if the Court were to accept SETC's interpretation, and read Article 8 of the Know–How Transfer Agreement as saying that "[t]he rights and obligations of Cenicom under the [Cenicom Assignment Agreement] will be assigned to [SETC]," Plaintiff would still not prevail on this point because of the use of the future tense in the Know–How Transfer Agreement. Other provisions of the Know–How Transfer Agreement used language of conveyance in the present tense. *See, e.g.*, Art. 2.1 ("Cenicom hereby sells and transfers...."). Thus, the parties clearly knew how to express the intent to contemporaneously execute an assignment of rights, strongly suggesting that the use of "will be assigned" in Article 8 did *not* represent a contemporaneous transfer. *See Matter of Prof. Staff Cong.-CUNY v. N.Y. State Pub. Employment Relations Bd.*, 7 N.Y.3d 458, 468, 824 N.Y.S.2d 577, 857 N.E.2d 1108 (N.Y.2006) (holding that the use of a particular clause in a parties prior agreements' suggests that they had no such intent in the contract under consideration); *Nicholas Laboratories, Ltd. v. Almay, Inc.*, 900 F.2d 19, 21 (2d Cir.1990) ("The appearance of 'terminate' or 'termination' four separate times in paragraph 9 indicates that the parties knew how to communicate their intention that a certain condition would give rise to a right to terminate.

The absence of 'termination,' or a synonym, [elsewhere] indicates that the parties" had no such intention in regards to that provision). The Patent Assignment Agreement, executed by the same parties on the same day, also uses the present tense. *See* Patent Assignment § 2.1 ("Assignor does hereby transfer and assign...."). The Cenicom Assignment Agreement, which Plaintiff's counsel represented was drafted by the same patent firm, *see* Prelim. Inj. Hearing Tr. [doc # 58] at 48, also uses the present tense when indicating a contemporaneous transfer or assignment. *See, e.g.*, Cenicom Assignment Agreement, Art. 3.2–3.5.

It is undisputed that no subsequent instrument purporting to transfer Cenicom's rights and obligations under the Cenicom Assignment Agreement to SETC was ever executed. Thus, even assuming, *arguendo*, that the Court believed SETC's reading of Article 8 of the Know–How Transfer Agreement, SETC still has not carried its burden to demonstrate that the use of the future tense was actually intended to be a contemporaneous transfer, rather than merely an expression of future intent.

 To be clear, the Court need not, and does not, reach any final conclusion as to the precise meaning of any provision of the Know–How Transfer Agreement—or, for that matter, any other agreement at issue here. It is sufficient for the limited purposes here to hold, as the Court does, that SETC has not carried its burden of demonstrating by a preponderance of the evidence that it is likely to succeed in demonstrating that an agreement to arbitrate exists among these parties.

### B. *Equitable Estoppel*

SETC's alternative argument, based on equitable estoppel, is similarly without merit. In certain circumstances, the Sec-

ond Circuit has held that, "under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute." *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 177 (2d Cir.2004). To compel arbitration under an estoppel theory, the non-signatory (here, SETC) must show two things. First, the subject matter of the dispute that it wishes to arbitrate must be "intertwined" with the agreement that the party it wishes to estoppel has signed (here, the Cenicom Assignment Agreement). *Id.* Second, non-signatory SETC must demonstrate that it shares a relationship with Defendants of a particular nature such that it would be unfair to permit Defendants to avoid arbitrating with SETC a dispute that, had it arisen instead between them and Cenicom, Defendants would have been obligated to arbitrate. *See Ross v. American Exp. Co.*, 547 F.3d 137, 143–44 (2nd Cir.2008); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir.2008); *JLM Indus.*, 387 F.3d at 177–78.

The first requirement is undisputedly met here, as SETC has alleged that Defendants have breached the same contract that contains the arbitration clause—the Cenicom Assignment Agreement. *See* Compl. [doc. #1] ¶¶ 2–5. Therefore the equitable estoppel argument turns on the second factor. Neither party spent a significant amount of time addressing the estoppel argument, but SETC's argument for why the second requirement is met seems to be based on its view of the relative blameworthiness of Defendants vis-a-vis the other relevant actors. SETC says that Defendants, through their words and actions, induced a variety of individuals—Ron Derby, Robert Speiser, Sarah Wang, and third-party investors in SETC—to spend time and capital developing the Intellectual Property, while Defendants' own conduct was "carefully calculated to re-

quire [the] least amount of services and capital from themselves." Pl.'s Post–Hr'g Mem. [doc. #68] at 16. According to SETC, this conduct "underscores the very definition of equitable estoppel." *Id.*

While this argument by SETC may be directed to general notions of equity, it does not contain any of the relevant factors that the Second Circuit has identified as necessary for a nonsignatory to an arbitration agreement to invoke equitable estoppel. And while there is certainly *a* relationship between the parties here, the Second Circuit has emphasized in a pair of recent cases that not just *any* relationship will suffice to justify equitable estoppel; for the latter would be difficult to reconcile with the "bedrock principle[ ] of arbitration law" that "arbitration 'is a matter of consent, not coercion.'" *Ross*, 547 F.3d at 142–43 (*quoting Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)); *see also Sokol Holdings*, 542 F.3d at 359. Therefore, the relationship between the parties must be such that it was (or should have been) reasonably foreseeable to the first signatory party (here, Defendants) that the non-signatory now seeking to compel arbitration (SETC) eventually would become, *with the first signatory's knowledge and consent*, affiliated with the second signatory party (Cenicom). *See Ross*, 547 F.3d at 143.

In both *Ross* and *Sokol Holdings*, the Second Circuit discussed at considerable length the circumstances that give rise to a valid claim of equitable estoppel. *See Ross*, 547 F.3d at 144–46; *Sokol Holdings*, 542 F.3d at 358–62. In *Sokol Holdings*, the Second Circuit explained that in each of its cases enforcing an equitable estoppel argument

the promise to arbitrate by *x*, the entity opposing arbitration, was reasonably

seen on the basis of the relationships among the parties as extending not only to $y$,[1] its contractual counterparty, but also to $y^1$, an entity that was, or would predictably become, with $x$'s knowledge and consent, affiliated or associated with $y$ in such a manner as to make it unfair to allow $x$ to avoid its commitment to arbitrate on the ground that $y^1$ was not the very entity with which $x$ had a contract.

*Id.* at 361. As explained below, the court declined to apply equitable estoppel because one party had become associated with the arbitration agreement through wrongful conduct. *Id.* at 362; *accord Ross,* 547 F.3d at 146 ("Amex's only relation with respect to the cardholder agreements was a third party allegedly attempting to subvert the integrity of the cardholder agreements.").

A review of the facts in *Sokol Holdings* is sufficient to decide SETC's claim here. There, the Plaintiff, Sokol (a corporation) had signed a contract with an individual named Tolmakov, who was the primary owner of Emir Oil, LLP ("Emir Oil"), to buy most of his stake in the company. That contract (the "Emir Contract") had an arbitration clause. Despite the Emir Contract, however, Mr. Tolmakov decided to sell the same interest promised to Sokol to a different corporation instead, BMB Munai, Inc. ("BMB"). BMB then made Emir Oil its wholly-owned subsidiary, and hired Mr. Tolmakov as its general manager. Sokol subsequently sued BMB for tortious interference of Sokol's rights under the Emir Contract by allegedly inducing Mr. Tolmakov to sell Emir Oil to BMB instead. *See Sokol Holdings,* 542 F.3d at 357. Although obviously not a party to the Emir Contract, BMB sought to compel Sokol to arbitrate the dispute by invoking the arbitration clause in the Emir Contract under the principle of equitable estoppel. The subject matter of the dispute was clearly "intertwined" with the Emir Contract, and BMB asserted that it shared a "close corporate and operational relationship with Mr. Tolmakov, Sokol's counterparty to the Emir Contract." *Id.* at 362.

BMB's relationship with Mr. Tolmakov, of course, was based on the allegedly wrongful acts of both Mr. Tolmakov (in breaching the Emir Contract) and BMB (in inducing him to do so). On that basis, the Second Circuit flatly rejected BMB's argument. *See id.* ("BMB's argument makes a mockery of the precedents on which it relies"). Judge Pierre Leval, writing for the panel, explained that because of Sokol's allegations that BMB had become associated with Mr. Tolmakov by wrongfully inducing him to breach his obligation under the Emir Contract with Sokol, "there would be no unfairness in allowing [Sokol], the victim of the tortious interference, to insist that, while [it] agreed to arbitrate with [its] contractual counterparty [Tolmakov], [it] in no way consented to extend that agreement to an entity which tortiously subverted [its] rights under the agreement." *Id.* at 362.

The facts in the case are quite similar to those in *Sokol Holdings.* Defendants (as well as Mr. Derby) had a contract with Cenicom in which they agreed to arbitrate disputes arising out of it. Defendants have alleged that Mr. Derby, acting as the President and/or Managing Member of Cenicom, violated his fiduciary duties to them by transferring all of Cenicom's assets without their knowledge or consent, and for no consideration, to SETC, for which he is now an officer and director. *See* Defs.' Reply in Supp. of Mot. to Dismiss [doc. # 55] at 4–5; Defs.' Post–Hr'g Mem. [doc. # 69] at 4–6. As in *Sokol Holdings,* Defendants here have sued one of the alleged wrongdoers, Mr. Derby, for his allegedly wrongful acts, *see* Am. Compl.,

*Dampier et al. v. Solar & Environ. Tech. Corp., et al.,* No. 30–2009–124965 (Cal.Super.Ct. Aug. 21, 2009) [doc. # 56–2], as well as Mr. Speiser, who represented the other party to the allegedly wrongful acts, SETC. *Id.* Unlike in *Sokol Holdings,* though, where BMB was apparently a stranger to Sokol, in this case, Mr. Speiser, although he was acting on behalf of SETC when he signed the SETC Agreements, *also* likely owed the Defendants fiduciary duties, because he, too, was a member of Cenicom. Thus, if Defendants' allegations are true, not only did the SETC Agreements deprive them of assets without their knowledge or consent, but the individuals responsible for this deprivation were supposed to be looking out for their financial interests, and those same individuals have benefitted financially from their alleged self-dealing in connection with the SETC Agreements.

■ The Court possesses neither the factual record nor the jurisdiction to reach any final conclusions as to the overall merit of the parties' claims of wrongdoing— and to be clear, at this point in the case, both parties' allegations of wrongdoing and denials thereof stand on equal footing. Nor does the Court in this case seek to disparage the concept of equitable estoppel to compel a non-signatory to arbitrate a dispute with a signatory. However, the facts and holding of the Second Circuit's decision in *Sokol Holdings* compel the conclusion that SETC may not rely on equitable estoppel to force Defendants to arbitrate disputes with SETC. *Cf. Precision Instrument Mfg. Co. v. Automotive Main-*

*tenance Machinery, Co.,* 324 U.S. 806, 813, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (discussing the doctrine of unclean hands: "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.").[6]

### III.

■ Even if SETC could demonstrate that there is an arbitration agreement among the parties or that Defendants are estopped from avoiding arbitration—neither of which has been shown—SETC would still not be entitled to a preliminary injunction, for it has not carried its burden to demonstrate that it would suffer irreparable harm in the absence of the injunction. "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir. 2009) (*citing Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999)). Generally speaking, when money damages can compensate a party for anticipated injuries, preliminary injunctions are inappropriate "except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir.2005). Here, SETC argues that it will be irreparably harmed in the absence of an injunction because Defendants, through their new company, Omnium, will disclose SETC's "confidential information concerning its intellectual

---

**6.** Although the Second Circuit did not phrase its decision in *Sokol Holdings* in terms of the "unclean hands" doctrine, the parties did brief the issue. Sokol explicitly argued that the doctrine prevented BMB from availing itself of equitable estoppel, *see* Brief of Plaintiff–Appellee, *Sokol Holdings v. BMB Munai, Inc.,* No. 07–2871–CV, 2007 WL 6196823 (2d

Cir.2007), while BMB, argued that applying the unclean hands doctrine would require the court to assume Sokol's allegations of wrongdoing to be true without any basis for doing so and would defeat the purpose of estoppel in arbitration cases. *See* Brief of Defendant–Appellant, 2007 WL 6196824.

property" to potential investors. Pl.'s Reply in Supp. of Prelim. Inj. [doc. # 53] at 4–5.

There is some support for the idea that the disclosure of trade secrets alone can constitute irreparable harm. *See, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984) (per curiam) ("[T]he loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is, of course, lost forever."). Some courts have even held that "irreparable harm is presumed where a trade secret has been misappropriated." *Ivy Mar Co. v. C.R. Seasons, Ltd.,* 907 F.Supp. 547, 567 (E.D.N.Y. 1995). However, in a case not unlike this one, the Second Circuit recently clarified that:

> Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption [of irreparable harm] is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

*Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118–19 (2d Cir.2009).

Here, SETC's incentives to maintain the confidentiality of the disputed Intellectual Property overlap completely with those of Defendants. If and when Defendants disclose any confidential information, such as to potential investors, it would almost certainly be under the same conditions on which SETC itself would insist. Defendants hope eventually to own the disputed

Intellectual Property free and clear of any competing claim by SETC; the last thing Defendants would want is for it to be devalued between now and then by their own actions in disclosing proprietary information. In any event, SETC has not shown that Defendants have already disclosed, or intend in the future to disclose, the Intellectual Property to the world in derogation of the rights Defendants assert. Given this alignment of interests, it appears that "the only possible injury that the plaintiff may suffer is a loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Faiveley Transport,* 559 F.3d at 119 (*quoting Geritrex Corp. v. Dermarite Indus., LLC,* 910 F.Supp. 955, 966 (S.D.N.Y.1996) (alterations in original)). Therefore, SETC is unable, at least on the record here, to show any threat of irreparable harm that can support a preliminary injunction.

■■■ Therefore, even if there were an agreement to arbitrate between these parties—and SETC has not demonstrated that—the Court would still deny SETC's motion under Rule 65(d) for a preliminary injunction in aid of arbitration.

**IV.**

As mentioned at the outset, the only relief explicitly requested by SETC is a preliminary injunction in aid of arbitration. *See* Compl. [doc. # 1] at 11–12.[7] However, cognizant of the possibility that SETC could argue that it had implicitly petitioned for an order to compel arbitration, *see Wabtec Corp. v. Faiveley Transport Malmo AB,* 525 F.3d 135, 137 (2d Cir. 2008); *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.,* 374 F.3d 1, 5–6 (1st

---

7. SETC initially requested a mandatory injunction as well, but withdrew it at the evi-

dentiary hearing. *See* note 2, *supra.*

Cir.2004), the Court notified the parties on September 17, 2009 that it would construe Plaintiff's filings to also request an order compelling arbitration under the FAA, 9 U.S.C. § 4. *See* Notice [doc. # 64]. Even so construed, however, SETC's motion fails.

With the FAA, Congress sought to put arbitration agreements on equal footing with other freely-bargained contracts, and explicitly preempted state laws that disfavored arbitration. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) ("[T]he purpose of Congress in 1925 [in enacting the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so."). Section 2 of the FAA provides that:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Act's enforcement procedures are found in § 4, which permits a party to an arbitration agreement to petition any U.S. district court that, in the absence of the agreement, would have subject matter jurisdiction to hear the dispute for an order compelling arbitration. 9 U.S.C. § 4. If the court is satisfied that "the making of the agreement for arbitration or the failure to comply therewith is not in issue," it should issue an order compelling arbitration. *Id.* However, "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." *Id.* If either the jury (if demanded) or the judge finds that "no agreement in writing for arbitration was made ...," the proceeding shall be dismissed." *Id.* *See also Buckeye Check Cashing, Inc. v.*

*Cardegna,* 546 U.S. 440, 444 n. 1, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (noting that it is for the courts to decide "whether any agreement between the alleged obligor and obligee was ever concluded.").

■ As discussed at length above, the Court concludes that, although the Cenicom Assignment Agreement does contain an arbitration clause, SETC has not carried its burden to demonstrate that it acquired Cenicom's rights under it. As between these parties, then, "no agreement in writing for arbitration was made." 9 U.S.C. § 4. Therefore, even if the Court were to take SETC to be requesting an order to compel Defendants to arbitrate, the request is denied. There being nothing further before the Court, this proceeding is dismissed. *Id.*

**V.**

In summary, the Court GRANTS the Defendants' Motion to Dismiss [doc. # 35] insofar as it is construed as based upon Rule 12(b)(6) only, and DENIES the Plaintiff's Motion for a Preliminary Injunction [doc. # 1]. **The Clerk is instructed to close this case.**

IT IS SO ORDERED.